Anne M. **HART**, individually and as natural guardian for Gillian Elaine Hart, Vera Lee Hart, Plaintiffs–Appellees,

v.

**UNITED STATES of America,
Defendant–Appellant.**

No. 89–3193.

United States Court of Appeals,
Eleventh Circuit.

March 1, 1990.

1540

Michael P. Finney, Asst. U.S. Atty., Pensacola, Fla., Robert S. Greenspan, U.S. Dept. of Justice, Civil Div., Appellate Staff, Thomas M. Bondy, Major James M. Kinsella, U.S. Air Force, General Litigation Div., Office of the Judge Advocate Gen., Lt. Col. Wm. C. Kirk and Major James N. Hatten, Judge Advocate Gen., Dept. of the Army, Washington, D.C., for defendant-appellant.

Robert L. Crongeyer, Fran L. Frick, Pensacola, Fla., for plaintiffs-appellees.

Before JOHNSON, HATCHETT and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge:

The United States appeals the district court's grant of summary judgment in favor of appellee Anne Hart, 681 F.Supp. 1518, and the court's decision after a bench trial in favor of Vera Hart and Gillian Hart under the Federal Tort Claims Act, 28 U.S. C.A. §§ 1346(b), 2671–2680.

## I. STATEMENT OF THE CASE

### A. *Facts*

On December 21, 1972, during the Vietnam War, a United States Air Force AC–1304 Spectre was hit by anti-aircraft fire and crashed near Pakse, Laos. Sixteen crewmen were aboard, including Lt. Col. Thomas Trammell Hart, III, a 32–year–old Table Navigator. Of the sixteen crew members, two parachuted to safety and were rescued. Friendly Laotian forces found the arm and hand of one crew member at the crash site; these remains were identified as belonging to Capt. Joel Birch. A captured Pathet Lao soldier claimed also to have found a pile of bloody bandages, five deployed parachutes, and the remains of five to six individuals which were subsequently buried in a common grave. Capt. Birch was declared killed in action ("KIA") and the thirteen missing crewmen were listed as missing in action ("MIA").

About five months after the Pakse crash, an American reconnaissance aircraft flying over an area of Northern Laos approximately three hundred miles from the Pakse site photographed what appeared to be a large area of tall grass that had been stomped down to read "1573 TH" or "1973 TH." Military intelligence indicated that the military believed the symbol referred to Lt. Col. Hart. This photograph, along with the testimony about the bloody bandages and deployed parachutes, was classified.

In 1978, President Carter lifted the injunction against status reviews of military personnel missing in Southeast Asia. The Air Force convened a status review board to review the status of the thirteen crewmen. The crewmen's families were informed that no classified material would be made available to them or considered in determining whether to change the crewmen's status. Thus, the existence of the photograph and the bandages and para-

chutes was not revealed.[1] The review board conducted a hearing and concluded that Lt. Col. Hart was dead. Mrs. Hart testified before the board that she concurred with this finding. Lt. Col. Hart's status, along with that of the twelve other missing crewmen, was thus changed from MIA to KIA.

In September 1982 members of the National League of Families, including Anne Hart, visited the crash site. The group recovered several bits of airplane skin, a metal flight boot insert, and two bone fragments, which Mrs. Hart turned over to the Government. The fragments were transmitted to the U.S. Army Central Indentification Laboratory in Hawaii ("CILHI"). In February 1985, a CILHI team excavated the Pakse crash site and recovered thousands of bone and tooth fragments, personal effects, and I.D. tags.[2] This material was transmitted to the CILHI laboratory. After approximately four months of study, CILHI recommended to the Armed Services Graves Registration Office ("ASGRO") that the thirteen crewmen be listed as identified. CILHI stated that it had found very small numbers of bone fragments corresponding to each crewman; these pieces, along with their location at the crash site and various personal effects, led to CILHI's conclusion. ASGRO accepted CILHI's recommendation, and Mrs. Hart was notified on July 1, 1985 that her husband had been identified. Mrs. Hart was told at this time that the identification was the result of a process of elimination.

Mrs. Hart immediately requested that she be allowed to have an expert examine the remains at her expense and provide a second opinion.[3] This request was denied. Mrs. Hart subsequently contacted Dr. Michael Charney, a forensic anthropologist at Colorado State University, to determine whether he would be willing to provide the

---

1. Mrs. Hart later obtained this information from other sources.

2. No. I.D. tags, dental material, or personal effects belonging to Lt. Col. Hart were found.

3. Mrs. Hart became concerned that the identification was arbitrary when she realized that

there had been 13 positive identifications. She felt that CILHI did not consider that five individuals may have been buried in a common grave. She also felt that there should have been 14 identifications, because only Capt. Birch's arm and hand were found.

second opinion. After determining that Dr. Charney would be so willing, Mrs. Hart filed suit in the Northern District of California. She sought injunctive relief prohibiting the Government from forwarding the remains to the families before Dr. Charney examined them. The district court granted a temporary injunction. Dr. Charney examined the bones purported to belong to Lt. Col. Hart and concluded that it was impossible to tell whether those fragments came from Lt. Col. Hart or even from an individual at the crash site.

Based on Dr. Charney's disagreement with the CILHI conclusion, the case was dismissed with prejudice. Left unresolved was the question of what to do with the disputed remains; Mrs. Hart refused to accept them, making her the first family member to refuse to accept remains. Government counsel told the district judge that the remains would be held in mortuary storage. Based on his confidence in the Government identification, however, Secretary of the Air Force Verne Orr sent a letter to Mrs. Hart on October 9, 1985 stating that if she did not wish to accept the remains, they would be buried at Arlington National Cemetery with full military honors. December 2, 1985 was set as the interment date.

Meanwhile, the Army decided to commission an independent civilian inquiry into the CILHI identification. Drs. Ellis R. Kerley, William R. Maples, and Lowell Levine, forensic anthropologists and fellows of the American Academy of Forensic Scientists, were enlisted as the investigating team. Mrs. Hart heard of the investigation and requested that the burial of the remains be delayed. Secretary Orr complied with this request. From December 9 through December 12, 1985, the team conducted an on-site inspection of the CILHI laboratory. The team found that the administration of CILHI was excellent and that CILHI's personnel were dedicated, well-trained, and experienced.

The panel concluded, however, that it could confidently confirm only two of the Pakse identifications. The other identifications did not appear to be justified according to standard forensic methods and could not withstand scientific scrutiny. The team's report recommended some changes in CILHI procedure and personnel. Drs. Kerley and Maples saw the actual Pakse remains after the issuance of their report. After viewing the remains themselves, the two doctors affirmed their earlier findings that the remains did not provide sufficient information to make the kinds of identifications CILHI had made.

The Air Force contacted the families of the thirteen crew members and explained that, if they wished, the identifications of their loved ones would be reconsidered. Mrs. Hart and the family of Capt. George McDonald requested such reconsideration. On June 10, 1986, ASGRO rescinded the identifications of Lt. Col. Hart and Capt. George McDonald. The Government did not, however, return Lt. Col. Hart to unaccounted-for status.

### B. *Proceedings Below*

On October 30, 1986, after exhausting their administrative remedies, Anne Hart, along with Lt. Col. Hart's mother, Vera Lee Hart, and Lt. Col. Hart's daughter, Gillian Elaine Hart, filed suit in the Northern District of Florida. The Harts sued under the Federal Tort Claims Act ("FTCA") for the intentional infliction of emotional distress as defined by Florida law. The complaint alleged that the Army and Air Force knowingly made a false positive identification of Lt. Col. Hart's remains, that they persisted in this identification in spite of overwhelming evidence to the contrary, that they improperly issued an "ultimatum" about burial, and that they refused to return Lt. Col. Hart to unaccounted-for status after rescinding his identification. The Harts also produced evidence which they claim proves Lt. Col. Hart may still be alive.

The Government filed a motion to dismiss on December 29, 1986. The Government argued, among other things, that the court had no jurisdiction under the FTCA's "discretionary function" exception, 28 U.S. C.A. § 2680(a). The district court denied the motion on March 17, 1987. The

Government filed a motion for reconsideration, which was denied on May 13, 1987. The Government also requested certification of the "discretionary function" question to this Court under 28 U.S.C.A. § 1292(b); the district court denied this motion.

On May 26, 1987, the Government filed its answer. On October 21, 1987, the district court ruled pursuant to the Harts' motion that the Government had admitted all of the matters with respect to which the Harts had sought admission.[4] The Harts moved for partial summary judgment on September 21, 1987. On January 12, 1988, the court granted the motion, finding the Government liable to Anne Hart under Florida law for intentional infliction of emotional distress. After a bench trial on October 6, 1988, the district court found the Government liable to Vera and Gillian Hart as well.[5] On October 20, 1988, the court awarded the plaintiffs a total of $632,814.62: $382,814.62 for Anne Hart and $125,000.00 each for Vera and Gillian Hart.

## II. ISSUES

The Government appeals to this Court, claiming that the district court erred in denying the Government's motion to dismiss based on the FTCA's "discretionary function" exception. We also consider whether the district court erred in granting Anne Hart's motion for summary judgment and in holding the Government liable for the intentional infliction of emotional distress.

**4.** Federal Rule of Civil Procedure 36(a) states that matters contained in a request for admission are deemed admitted unless they are answered in writing within 30 days after service of the request. The Harts appear to have filed their request for admissions on May 29, 1987; the Government responded on September 10, 1987. Because the response was submitted more than 30 days after service, the court was correct in deeming the matters admitted. The Government argues that the district court erred in not allowing the admission to be withdrawn or amended under Rule 36(b), which states that the court may allow such action upon motion if presentation of the merits would be subserved thereby and if the requesting party fails to prove prejudice. Because the Government states on

## III. ANALYSIS

### A. *Discretionary Function*

#### 1. *Definition*

■ The question of whether the district court had jurisdiction to consider the Government's actions in this case under the discretionary function exception is a question of law, subject to *de novo* review by this Court. *Baker v. United States*, 817 F.2d 560, 562 (9th Cir.1987), *cert. denied*, 487 U.S. 1204, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988). The FTCA provides that federal courts have jurisdiction to entertain tort suits against the federal government, unless such suits involve:

(a) Any claim based upon an act or omission of an employee of the Government ... or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C.A. § 2680(a). *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 809, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). The discretionary function exception expresses a congressional intent to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765.

■ The Supreme Court has isolated several factors in analyzing the exception. First, "it is the nature of the conduct, rath-

appeal that the admissions do not harm its case, however, we do not disturb this ruling.

**5.** The court dealt separately with the parties due to some confusion in the pleadings. At the time of the initial filing, all of the children were apparently below the age of majority. Mrs. Hart thus submitted evidence only as to her own suffering. After granting her motion for summary judgment, the district court discovered that Lt. Col. Hart's mother and daughter (who had since reached majority) also sought damages. Because no evidence had been submitted as to their suffering, the district court held a bench trial on these issues.

er than the status of the actor, that governs whether the discretionary function exception applies...." *Varig*, 467 U.S. at 813, 104 S.Ct. at 2764. Thus a court must ask whether the challenged acts, whatever the rank of the actor, "are of the nature and quality that Congress intended to shield from tort liability." *Id.* This involves determining whether the action was "a matter of choice for the employee." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). For this reason, the exception does not apply if a federal statute, policy, or regulation specifically mandated the action. *Id.* at 1958, 1959.

Second, the Court has defined discretionary decisions as those in which there is room for policy judgment. *United States Fire Ins. Co. v. United States*, 806 F.2d 1529, 1535 (11th Cir.1986) (quoting *United States v. Varig Airlines*, 467 U.S. at 811, 104 S.Ct. at 2763). The discretion referred to is "the discretion of the executive or the administrator to act according to one's judgment of the best course...." *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953); *see also Ostera v. United States*, 769 F.2d 716, 718 (11th Cir.1985); *United States Fire Ins. Co.*, 806 F.2d at 1535. For example, "[a] Governmental act is discretionary and therefore shielded from liability if it is performed at a planning rather than operational level." *Drake Towing Co., Inc. v. Meisner Marine Constr. Co.*, 765 F.2d 1060, 1064 (11th Cir.1985) (quoting *Dalehite*, 346 U.S. at 42, 73 S.Ct. at 971).

### 2. *Decisions Regarding Lt. Col. Hart*

#### a. *U.S. Efforts to Identify Dead Servicemen*

The United States argues that all government efforts to identify and bury dead United States servicemen are based entirely upon policy judgments, so that any act taken in connection with that effort should fall under the exception. The Government maintains that its actions in this case reflect a longstanding policy of attempting to search for, recover, and identify dead American servicemen. This policy was developed for two reasons. First, the United States military maintains that everyone who dies in service to the United States deserves burial with full military honors. Second, POW/MIA families during the Vietnam era expressed a desire for the Government to attempt to identify individual remains if possible. Thus, the Government argues that the identification procedures used in this case were not merely scientific and forensic, but also were based on issues of public policy.

The Harts respond that methods used by CILHI to identify the remains in this case did not comport with ordinary forensic standards. They argue that the Army's forensics examiners, like doctors, should be judged by the standards of due care applicable to the forensics profession if that profession provides no set rules for a particular case. *See Hendry v. United States*, 418 F.2d 774, 783 (2nd Cir.1969) ("To the extent that the medical profession establishes no set rules to accommodate the handling of a particular medical case, the individual doctor's judgment in that case should be measured by the standards of due care.").[6]

We are persuaded by the Government's argument. Government efforts to identify deceased personnel are clearly discretionary functions. Further, ordinary forensic standards are inappropriate in cases such as the Pakse crash, when the remains of a number of persons are commingled, severely burned, and shattered. In such cases, military forensics examiners draw

---

**6.** The Harts also argue that the Government's actions in this case were not discretionary under *Kohn v. United States*, 591 F.Supp. 568 (E.D. N.Y.1984), *aff'd*, 760 F.2d 253 (2nd Cir.1985). Kohn was shot in the head by a fellow officer. His family sued under the FTCA, claiming that Kohn's organs were cremated and his body was embalmed without their knowledge and contrary to their religious beliefs, and that they were misled regarding the circumstances of his death. *Kohn*, while similar in some ways to the present case, is not applicable. The government in *Kohn* did not argue the discretionary function exception. *Id.* at 571. Further, the Army's actions in *Kohn* appear to have violated a specific Army policy. *Id.* at 573–74. Finally, *Kohn* did not involve decisions made by coroners in the context of intermingled remains.

conclusions not only from the remains themselves, but from the fact that the remains were recovered at the crash site, that personal effects were found among the remains, that the remains showed the effects of high temperatures associated with fires and explosions, and that the deceased personnel were listed as crew members on the plane's manifest. The technique is similar to a process of elimination; remains are likely to belong to one person if they are not likely to belong to anyone else. The Army examiners also use anthropological approximations, inferring characteristics such as height and age from the bone fragments.[7] These inferred characteristics are compared with the known characteristics of the missing crewmen.

The discretionary nature of these processes is particularly evident with regard to the identification techniques used by CILHI. CILHI specializes in identification of remains from mass military disasters, such as the Iraqi bombing of the *U.S.S. Stark*, the terrorist bombing of the Marine barracks in Lebanon, and the plane crash in Gander, Newfoundland. The forensic procedures discussed above are often used in such situations. The decision to use these methods is an exercise of discretion dependent on the circumstances; it is up to the discretion of the individual forensics examiner to determine how much to rely on these techniques.[8]

For the reasons discussed above, we find that the United States' efforts to identify the thirteen servicemen were discretionary

functions, and that the court below had no subject matter jurisdiction to consider a challenge to those functions. In reaching this conclusion, we do not leave family members without remedy. Family members may challenge mistakes through military channels such as the Armed Forces Board of the Military or ASGRO. We simply decide that the identification procedures involved were administrative decisions grounded in social policy, which should not be second-guessed by the courts. Like nonjusticiable political questions, these procedures required decisions which "lack ... judicially discoverable and manageable standards for resolving [them]" and were "impossib[le] [to decide] without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

### b. *Lt. Col. Hart's Unaccounted-for Status*

As discussed *supra*, the discretionary function exception does not apply if a government policy specifically prescribes an action and that policy is violated. *Berkovitz*, 108 S.Ct. at 1958; *United States Fire Ins. Co.*, 806 F.2d at 1537. The Harts point to a POW/MIA interagency memorandum which states that it was the practice of the Government to remove names from the unaccounted-for list as their remains were identified. The Harts argue that this practice establishes a specific federal policy, and that because Lt. Col. Hart's remains have not been positively identified,

---

7. Mrs. Hart claims that the anthropological records in this case were falsified, but offers no evidence in support of this claim.

8. The Harts argue that CILHI's actions directly contradicted the provisions in the Army Field Manual for Identification of Deceased Personnel. As discussed earlier, the discretionary function exception does not apply if a government policy or regulation specifically prescribes a course of action. *Berkovitz*, 108 S.Ct. at 1958. Similarly, an employee's improper implementation of a policy or discretionary decision does not fall under the exception. *See United States Fire Ins. Co.*, 806 F.2d at 1537 (Coast Guard's decision to use method of "last resort" on operational decision not exempted from the FTCA); *Drake Towing*, 765 F.2d at 1065 (Coast Guard

decision to establish navigational aids without determining safety characteristics of water not exempted from FTCA). If the Field Manual did indeed prescribe or proscribe specific methods for identifying remains in a Hart-type situation, CILHI's actions would not fall within the discretionary function exception. This argument is inapplicable, however, for two reasons. First, it does not appear that the Harts raised this contention below; in such a case, the claim is waived. *See Lattimore v. Oman Construction*, 868 F.2d 437, 439 (11th Cir.1989). Second, none of the sections cited by Mrs. Hart provides specific guidelines for what actions should be taken and how. At best, they state that all procedures should be carefully carried out and recorded.

the Government's failure to return his name to the unaccounted-for list violates that policy. Thus, they argue that the discretionary function exception cannot apply. *See Berkovitz,* 108 S.Ct. 1958–59.

The Harts, however, produce no evidence other than their own assertions that this practice is a federal policy. In fact, the Government's policy seems to be embodied in its "Policy Position" statement, which states:·

> Clearly, in cases where the total evidence indicates that the persons involved in the incident were in fact killed and where recovery efforts were thorough and complete, we must conclude that the individuals have been accounted for.

The Harts also claim that this policy was violated. This argument fails for two reasons. First, it is not clear that the above-quoted statements constitute a federal policy for the purposes of the discretionary function exception. The exception does not protect required functions, thus it does not protect functions which are mandated by statute, regulation, or policy. The act of deeming an individual "accounted for" if recovery efforts were thorough is not man-

dated. It depends upon the circumstances and the recovery efforts.

Second, the total evidence·in this case indicates that the persons aboard the aircraft were killed. The plane took anti-aircraft fire in its forward fuel tank, resulting in a large mid-air explosion. The two men who parachuted to safety were located at the rear of the plane, away from the fuselage; Lt. Col. Hart was in the front of the plane. The two rescued men did not see anyone else survive. Remains were found scattered about the crash site.[9] There is no evidence indicating that the search was not thorough. The CILHI team divided the crash site into sectors and dug down as deep as 14 feet in some areas. They recovered some 50,000 bone fragments, ID tags, and personal effects.[10] Even if the statement discussed above did constitute federal policy, the decision to label Lt. Col. Hart "accounted for" did not violate that policy.

■ Mrs. Hart expresses concern that the decision to label her husband "accounted for" may encourage his captors to kill him in the event that he is alive and held hostage, or may doom Lt. Col. Hart to live out his life in a prison camp.[11] The

9. The Harts argue that the aerial photograph and the enemy soldier's testimony of bloody bandages and parachutes prove that Lt. Col. Hart is still alive. They also point to an affidavit by former Congressman William Hendon of North Carolina, in which he concludes that Hart is still alive. The House Select Committee on Missing Persons in Southeast Asia, H.R.Rep. No. 94–1764, 94th Cong., 2d Sess. (1976), investigated the Pakse crash. The Committee found that it was unclear whether the parachutes were flare chutes, personnel chutes, or drogue chutes, and that the parachutes might have been deployed by the force of the crash. The Committee found that the bloody bandages were found 10 kilometers from the crash site, in an area where both Royal and Pathet Lao forces were active. Based upon this and other information, the Committee concluded that the evidence overwhelmingly pointed to the death of all the crew members. Similarly, the Defense Intelligence Agency determined that the symbols in the aerial photograph were more likely attributable to victims of a crash occurring only five miles from the site of the photo.

Further, most of the evidence pointed to by the Harts is military intelligence information. The Supreme Court has recognized that judges have "little or no background in the delicate business of intelligence gathering." *CIA v. Sims,* 471 U.S. 159, 176, 105 S.Ct. 1881, 1891, 85

L.Ed.2d 173 (1985). Similarly, the Fourth Circuit has noted that courts are "inexpert and unfamiliar" with intelligence reports. *Smith v. Reagan,* 844 F.2d 195, 200 (4th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). Because the decision as to how much weight to give this evidence is discretionary, the decision whether to credit this evidence, and to what degree, falls under the discretionary function exception.

10. The Harts argue that the recovery efforts at the crash site were not thorough and complete. They point to the district court's conclusion that the recovery efforts were not thorough because the CILHI party never found the common grave described by the captured Pathet Lao soldier. Again, the decision regarding the credibility of the enemy soldier is purely discretionary. There is no guideline or standard defining appropriately thorough search procedures.

11. The Government explains in its reply brief that information regarding deceased personnel is kept on file even after such personnel are proclaimed "accounted for"; "accounted for" and "identified" are not equal in Army terminology. In fact, it was reported that Hart was captured alive in 1988, and a sighting of a "Tommy Hart" was reported in Laos in the same

Government, however, must make a practical decision at some point regarding when to discontinue the search for personnel. Such a decision must be discretionary in order for the Government to practically pursue such searches. Concerns such as Mrs. Hart's "frequently raise questions which are political and nonjusticiable in nature." *Alabama Elec. Co-op, Inc. v. United States,* 769 F.2d 1523, 1530 (11th Cir. 1985) (quoting *Hendry,* 418 F.2d at 7831). This is just such a question.

### c. *Secretary Orr's Letter*

 Finally, Mrs. Hart argues that Secretary Orr's letter telling her that if she did not claim the remains they would be buried is actionable. This is a prime example of the discretionary function. Because this was the first time a family member had refused to accept "identified" remains, there was no policy or procedure explaining what to do with the remains. Secretary Orr had to rely on his own discretion. Based upon his confidence in CILHI's track record and his belief that the remains had to be properly interred, he wrote the letter. Although there may have been other reasonable options available to Secretary Orr, he had the discretion to choose among those options.

### B. *The Merits*

 Although we find that the district court had no jurisdiction to hear the Harts' suit, we also note that the district court erred on the merits. To prove intentional infliction of emotional distress under Florida law, the plaintiff must prove: (1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe. *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278 (Fla.1985) (adopting definition laid out in Restatement (Second) of Torts § 46); *Dominguez v. Equitable Life Assur. Soc. of the United States,* 438 So.2d 58, 59 (Fla.App.1983). To grant summary judgment on such a claim,

the district court must find that there is no genuine issue of material fact regarding the claim. Fed.R.Civ.P. 56. This Court's review of the district court's grant of summary judgment is *de novo. Shipes v. Hanover Ins. Co.,* 884 F.2d 1357, 1359 (11th Cir.1989). Regardless of whether the Government's conduct caused severe suffering, we cannot find that the conduct complained of was intentional or outrageous.

 Conduct is intentional "[w]here the actor knows that [severe] distress is certain, or substantially certain to result from his conduct." *Ford Motor Credit Co. v. Sheehan,* 373 So.2d 956, 958 (Fla.App.), *cert. dismissed,* 379 So.2d 204 (Fla.1979). We have seen absolutely no evidence that the Government's acts in identifying, classifying, or attempting to bury the remains in question were committed with the knowledge that they would cause severe distress.[12]

 Outrageous conduct is conduct which "is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *McCarson,* 467 So.2d at 278–79 (quoting Restatement (Second) of Torts § 46 Comment (d) (1965)). The district court found that ASGRO's reliance on CILHI's identification was reasonable. The court found, however, that Secretary Orr issued an "ultimatum" to Mrs. Hart regarding burial without addressing the Government's statement that the remains would be stored. It also found that the Government took Lt. Col. Hart off the unaccounted-for list without considering the evidence of the common grave, the bloody bandages, the five parachutes, and the aerial photograph. The court concluded:

although, respecting some of the disparate acts of the government in this case a reasonable jury might find a particular act was not outrageous, taken as a whole outrageousness is proved; an average

---

year; the Government has been investigating this information.

**12.** The district court did not discuss this element of the tort.

member of society, upon recitation of these facts would exclaim, "outrageous." Outrageousness is proved herein as a matter of law.

The district court's conclusion is difficult to understand. CILHI took months to make its identifications and attempted to use what scientific methods it could to make sense of the sparse remains. The identification of Lt. Col. Hart's remains was made after considering CILHI's report and Mrs. Hart's testimony. It is not clear that the Government failed to consider the classified evidence in its identification decision. Instead, the Government decided that the classified information was not probative of its decision. Although Secretary Orr did send Mrs. Hart a letter telling her that if the remains were not claimed they would be buried, the Secretary promptly postponed the proposed interment at Mrs. Hart's request. The Government also rescinded the identification at Mrs. Hart's request. CILHI has subsequently implemented the majority of the changes suggested by the Army review panel. Mrs. Hart herself has testified that throughout the proceedings she was treated in a very pleasant manner.

The Harts point to two Florida cases and one New York case which they claim parallel this case in outrageousness. In *Kirksey v. Jernigan*, 45 So.2d 188 (Fla.1950), an undertaker took a five-year-old child's body and embalmed it without parental consent. The undertaker refused to return the body to the mother and, in fact, charged the mother twice the usual amount for embalming. In *Sherer v. Rubin Memorial Chapel, Ltd.*, 452 So.2d 574 (Fla.App.1984), a funeral home dressed the wrong cadaver and then tried to convince the family that the cadaver was their loved one. After the family prevailed, the funeral home would not dress the cadaver, but simply threw clothes over it. Finally, in *Kohn v. United States*, 591 F.Supp. 568 (E.D.N.Y.1984), aff'd, 760 F.2d 253 (2nd Cir.1985), the Army embalmed a soldier and cremated some internal organs without the family's consent. The family was orthodox Jewish, and such actions violated their faith. The Army also misled the family regarding the circumstances of the soldier's death.

These cases are starkly distinguishable from the Hart case. In each of the above cases, the defendants made mistakes which they deliberately tried to hide from the families. In this case, the Government has not intentionally foisted a mistake upon the Harts. It made its identification as best it could, and when that proved to be insufficient, it complied with every request made by the Harts except their request that Lt. Col. Hart be returned to unaccounted-for status. As explained above, that decision lies within the "policy judgment" discretion of the Army.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND with instructions to enter judgment for the United States.