**Rita M. SIMMONS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 90–CV–142.**

United States District Court, N.D. New York.

Jan. 8, 1991.

Edward S. Nelson, Norwich, N.Y., Stayton & Brennan (Rowe P. Stayton, of counsel), Denver, Colo., for plaintiff.

Frederick J. Scullin, Jr., U.S. Atty. (William H. Pease, Asst. U.S. Atty., of counsel), Syracuse, N.Y., U.S. Dept. of Justice, Civ. Div. (Philip H. Lynch, Sp. Atty., Torts Branch, of counsel), Office of the Judge Advocate General, Military Personnel Branch, Litigation Div., Dept. of the Army, The Pentagon (LTC Mark A. Steinbeck, Chief, Military Personnel Branch, of counsel), Washington, D.C., Office of the Judge Advocate General, General Torts Section, Claims and Tort Litigation Staff, Dept. of the Air Force (MJR Michael P. Frederick, Chief, General Torts Section, of counsel), Bolling Air Force Base, D.C., for defendant.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

This is a Federal Tort Claims Act ("FTCA") suit arising out of the reclassification of a soldier in Vietnam from missing in action ("MIA") to killed in action ("KIA"), and subsequent events which allegedly gave rise to damages suffered by the servicemember's family. On October 22, 1990, defendants United States and United States Air Force Mortuary Services moved to dismiss the complaint or, alternatively, for summary judgment. The court reserved decision on the motion pending plaintiff's filing of a motion to amend the complaint. Plaintiff filed her motion to amend the complaint to clarify and add new theories of liability, and also moved to dismiss the complaint as against the United States Air Force Mortuary Services because the FTCA permits only the United States to be listed as a defendant. Defendants did not contest either of these motions. The court granted the motions on December 7, 1990.

Plaintiff's amended complaint hinges on what she perceived to be the presumptive nature of defendant's reclassification of her son from MIA to KIA in 1977, and subsequent government use of the finding of one tooth belonging to Simmons as confirmation that he in fact was killed in action. Defendant moves to dismiss the amended complaint in its entirety, or alternatively for summary judgment on the amended complaint, on two grounds. Defendant asserts that, because the 1977 KIA decision was wholly separate from the 1987 determination that the tooth was the identifiable remains of Simmons, plaintiff's attempt to challenge the 1977 reclassification through the 1987 identification is barred by the two-year statute of limitations built into the FTCA, 28 U.S.C. § 2401(b). Moreover, as all aspects of plaintiff's amended complaint involve matters of judgment on the part of the acting government employees, defendant contends that plaintiff's challenges are independently barred by the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a). The court heard oral argument on defendant's motion on December 7, 1990 in Syracuse, New York. Documentation in addition to the pleadings was submitted by both parties, including Local Rule 10(j) statements, so the court will treat defendant's motion as a summary judgment motion. See Fed.R. Civ.P. 12(b). For the reasons stated below, defendant's motion is granted. The court's decision, however, is limited to the specific facts presented in this case. In granting defendant's motion for summary judgment, the court is not expressing judicial approval of the procedures pursued by the government regarding servicemembers who did not return from the Vietnam conflict. The court's ruling involves only the applicability of the FTCA's statute of limitations and discretionary function exception to the facts of this case.

## I. FACTS

On March 29, 1972, Senior Master Sergeant Robe.. E. Simmons was aboard an AC–130 Spectre gunship which took off from Ubon, Thailand on an armed reconnaissance mission over Savannakhet Province in the southern part of Laos. Simmons was one of fourteen crew members aboard; he was one of three aerial gunners. After arriving over the assigned

area, the gunship was struck by a surface-to-air missile and crashed. Witnesses reported that the plane exploded upon impact and several secondary explosions followed. No parachutes were seen. No voice transmissions were received from the plane after it was hit. However, the escort plane did pick up a brief beeper signal approximately ten minutes after the crash as it was circling the site trying to establish contact with the downed crew. No further signals were picked up, nor was any visual contact made.

Simmons was listed as MIA from the date of the crash until January 1973, when his case was reviewed in accordance with 37 U.S.C. § 555.[1] Upon review, the overseas commander recommended that Simmons' status be continued as MIA. Despite the unlikelihood of survival in that harsh environment for an extended period of time, the Air Force determined that it would be premature to rule out the chance that Simmons was still alive. By 1977, however, no additional evidence as to Simmons' fate was uncovered. Upon notice of a pending status review to be conducted by the Air Force, both plaintiff and her husband waived their right to be present at the hearing before the review board, and also waived their right to submit evidence for the board's consideration. On May 31, 1977, pursuant to 37 U.S.C. § 555(a)(2), the designee of the Secretary of the Air Force accepted the review board's recommendation and declared that Simmons "may no longer reasonably be presumed to be alive." His status as MIA was terminated and he was officially listed as KIA. Plaintiff was notified by telephone, telegram, and follow-up letter that her son's status was changed to KIA and that the presumed date of death for purposes of settling accounts would be the date of notification, May 31, 1977. Defendant's Exhibit ("Exh.") 1 at 3–6. The death gratuities, including $20,000 in proceeds from a servicemen's group life insurance policy and a posthumous promotion, were given to plaintiff effective as of the presumed date of death.

Since 1972, when her son was first declared MIA, plaintiff participated in National League of Families ("NLF," an association of MIA and KIA next of kin) activities and received other next of kin benefits such as verbal and written communications regarding the search efforts to locate her son. Defendant states that the benefits are extended under Coin Assist, a federal program designed to provide families of servicemembers whose remains have not been recovered with airfare to attend meetings of private organizations such as NLF, during which the families "receive information on the United States' continuing efforts to recover remains." Declaration of Major Arthur Gorman, Jr., Defendant's Exh. 22. Plaintiff asserts that the change of status in 1977 did not affect her family's receipt of these benefits. Plaintiff's understanding was that the status change was "presumptive only and subject to evidence to the contrary." Plaintiff's Amended Complaint ¶ 6.

New evidence regarding Simmons began to appear in 1985. In March of that year the American Embassy in Vientianne anonymously received a dog tag bearing Simmons' name and identification information. The FBI performed a metallurgical analysis on the tag and determined that there was no fire residue present. A Thai newspaper printed an article in April 1985 based on information provided by a Laotian liberation soldier that a number of American POWs were being held under hostile armed guard on the Laos–Vietnam border, and that five corpses had been collected by the liberation forces. Among the corpses was a "Simmong, Robfrte" bearing Simmons' ID number.

In February 1986, a joint United States–Laotian search and recovery team excavated the AC–130 crash site. They reported daily activities, described remains and personal effects uncovered, and mapped out

---

**1.** Section 555(a) provides, in relevant part:
When a member of a uniformed service ... has been in a missing in action status, and the official report of his death or of the circumstances of his absence has not been received by the Secretary concerned, he shall, before the end of a 12–month period in that status, have the case fully reviewed.

the location of the recovered materials with respect to the position of the gunship when it crashed. *See* Search & Recovery Narrative, Defendant's Exh. 2. They recovered a tooth amongst the remains which testing by the Central Identification Laboratory/Hawaii ("CILHI") revealed to be the upper right second molar of Simmons. On May 7, 1987, while she was at work, plaintiff received a phone call from C.R. Beauchemin, the senior mortuary specialist of the Air Force Mortuary Service in Florida, tentatively identifying the molar as the remains of Simmons. The identification was later confirmed by the Armed Forces Identification Review Board.

Plaintiff alleges that, after this phone call and the corresponding change in Simmons' status from "presumed dead, body not recovered" to "dead, body recovered," her family ceased to receive next of kin benefits. All communication regarding the ongoing search for MIAs stopped and her family was denied travel expenses to the National League of Families meeting held later in 1987. They were also denied membership in that organization.

In accordance with the requirements of the FTCA, plaintiff filed an administrative claim for damages totaling $750,000 with the Air Force Mortuary Service on April 25, 1989. Her claim stated that she was notified by telephone while at work on May 1, 1987, that her son's status "would be changed from missing in action to killed in action based on the discovery of a single tooth." Defendant's Exh. 11. Plaintiff further asserted that "[a]s a result of the governments [sic] behavior in this sensitive and delicate area, the Claimant suffered emotional distress for which she requests compensation." *Id.* Her claim was denied by the agency on February 2, 1990. The agency determined that, because the change in status from MIA to KIA occurred in 1977, plaintiff was time-barred from filing this claim. The agency stated that plaintiff "was provided the full range of administrative due process [in 1977] in that she was notified of the review in advance, waived a hearing, declined to make a submission, and was notified of the result." Defendant's Exh. 21. Moreover, to the extent that plaintiff's claim was based on the procedures followed during the 1986–87 sequence of events, the agency's investigation did not reveal any violation of procedure. On February 5, 1990, plaintiff filed the action now before the court.

## II. DISCUSSION

### A. *Statute of Limitations*

The FTCA provides federal district courts with "exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment...." 28 U.S.C. § 1346(b). The well-recognized purpose of this statute is to make a remedy available to a claimant for "negligence in the conduct of goverment activities" where it had previously been barred by sovereign immunity. *Indian Towing Co. v. United States*, 350 U.S. 61, 68, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955).

There are, however, various legal constraints on this waiver of immunity. A party's FTCA claim will be barred under § 2675(a) "unless the claimant [has] first presented the claim to the appropriate federal agency...." This section is designed to give the agency that is best informed about the activity which gave rise to the claim an opportunity to investigate, evaluate, and possibly settle the claim without litigation in federal court. *See* S.Rep.No. 1327, 89th Cong., 2d Sess. 7, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2515, 2516–17; *Johnson v. United States*, 788 F.2d 845, 848–49 (2d Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 288 (1986). Section 2401(b) requires that the administrative claim be filed with the agency within two years of the time the claim accrues, representing the congressional intent to encourage prompt presentation of claims against the government. *United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979). A claim is generally held to have accrued when the claimant knows of the

existence and probable cause of the injury. *Id.* at 122, 100 S.Ct. at 359; *Kramer v. Secretary, U.S. Department of the Army,* 623 F.Supp. 505, 509 (E.D.N.Y.1985).

Plaintiff asserts that her FTCA claim accrued in 1987, based on "[t]he notification by the Department of the Air Force ... declaring that SMSgt. Simmons was, in fact, positively known to be deceased, when the Department of the Air Force knew or should have known that discovery of a tooth does not confirm death, constitutes deliberate infliction of emotional harm, conduct compensable under the laws of the United States as well as under the laws of the State of New York." Plaintiff's Amended Complaint ¶ 28. Further, the Air Force's premature conclusion "that discovery of a tooth verifies death, ... ignoring contradictory evidence supplied by a qualified forensic scientist, Dr. Michael Charney [that there was no evidence that Simmons died at the time the tooth was lost], constitutes callous and outrageous conduct which directly caused severe mental distress to the Plaintiff." *Id.* ¶ 29.

■ Defendant moves for summary judgment on the ground that, despite plaintiff's contention that her claim arose in 1987, the amended complaint hinges on the 1977 change in Simmons' status from MIA to KIA and therefore is barred by the two-year statute of limitations. Defendant argues that plaintiff is clinging to the misperception that the 1977 reclassification decision was presumptive, when in fact that determination was conclusive. All of the correspondence sent to plaintiff in 1977 states that her son's status was changed from MIA to KIA. The Assistant Deputy Chief of Staff for Military Personnel, Brigadier General Herbert Emanuel, wrote:

Consideration of the facts and circumstances and the lapse of time during which no information concerning [your son's] whereabouts has been received lead to the conclusion that he may no longer reasonably be presumed to be alive. The [status review] panel recommended that your son's missing in action status be terminated and a determination be made that he was killed in action.

Under the provisions of [37 U.S.C. § 555], I have approved that recommendation.

Plaintiff's Exh. 1. Emanuel went on to say that the presumed date of death for purposes of terminating pay and settling accounts would be the date of the letter, May 31, 1977. The word presume was used twice. Neither, however, indicated that the KIA status was presumptive. In a telegram sent prior to the letter, Emanuel did state that "an official determination has been made to terminate his missing in action status by a presumptive finding of death," but that telegram was followed by the letter quoted above, which Emanuel indicated would include "all the known information on the incident." Defendant's Exh. 1 at 4. The letter unequivocally stated that "[a]n official report of this action has been issued by the Department of the Air Force indicating that Master Sergeant Simmons was killed in action." Moreover, both papers indicated that the family would be kept informed of information which may lead to the recovery of Simmons' remains. Thus, defendant contends that there can be no question about the conclusiveness of Simmons' KIA status in 1977. To bolster that contention, defendant refers to 37 U.S.C. §§ 555 and 556 involving status determination changes for MIA personnel. Section 555(a) states:

When a member of a uniformed service ... has been in a missing status, and the official report of his death or of the circumstances of his absence has not been received by the Secretary ..., [the case shall be] fully reviewed. After that review, ... the Secretary concerned or his designee, may—

.    .    .    .    .

(2) make a finding of death.

Section 556(a) states:

The Secretary concerned, or his designee, may make any determination necessary to administer this chapter and, when so made, it is *conclusive* as to—

(1) death or finding of death.

(emphasis added).[2] Therefore, plaintiff's contention that the 1977 KIA status of her son was presumptive must be found incorrect based upon the very statute authorizing changes in status.

The portions of plaintiff's amended complaint challenging the conclusiveness of her son's death based on the finding of one tooth must also be found incorrect. The determination that her son was killed in action was made in 1977. The discovery of the tooth and subsequent identification as belonging to Simmons was not designed to verify death, but rather to recover identifiable remains of this particular serviceman who was lost during the Vietnam conflict. Damages suffered by plaintiff as a result of the official change in her son's status to KIA therefore accrued in 1977, when that reclassification was made. Plaintiff cannot be permitted to circumvent the two-year FTCA statute of limitations by challenging the 1977 reclassification through the 1987 identification of the tooth as his remains.

It is noteworthy that plaintiff is not challenging the correctness of the decision to change her son's status from "KIA, body not recovered" to "KIA, body recovered" on the basis of one tooth. Phrased in terms of this status change, plaintiff's claim for damages would not be barred by the statute of limitations because this decision occurred in 1987. However, plaintiff's amended complaint revolves around the presumptiveness of her son's death, which as discussed above was conclusively determined based upon the evidence available in 1977. In fact, at oral argument plaintiff's attorney returned to the 1977 decision by stating that "to change someone from missing in action to killed in action should not be done mainly on the finding of one tooth." Counsel also stated that plaintiff believes her son is still alive. While the court is sensitive to plaintiff's emotional attachment to that belief, it does not provide the court with a basis for denying summary judgment on the facts of this case.

Therefore, to the extent that plaintiff's damages are based on the 1987 notification that "SMSgt. Simmons was, in fact, positively known to be deceased, when the Department of the Air Force knew or should have known that discovery of a tooth does not confirm death," plaintiff's claim is barred by § 2401(b) of the FTCA. Any challenges to the conclusiveness of death would have had to be raised within two years of the 1977 determination that SMSgt Simmons was killed in action. Defendant's motion for summary judgment as far as this aspect of plaintiff's complaint is concerned is hereby granted.

### B. *Discretionary Function Exception*

■ The second aspect of plaintiff's claim for damages is based on defendant's alleged failure to adhere to its own guidelines in excavating, documenting, and identifying remains. Plaintiff challenges the excavation procedures in that the remains recovered from the AC–130 crash site were not numbered, tagged, or otherwise identified as to the exact location they were found, which is "in direct contravention of rules, regulations and procedures promulgated by the Defendants in published guidelines." Plaintiff's Amended Complaint ¶ 14. Moreover, defendant allegedly failed to prepare appropriate documentation concerning the crash site. *Id.* ¶¶ 13, 16. Plaintiff also challenges the validity of the identification of the tooth. *Id.* ¶¶ 10–12, 17. Plaintiff submits two reports issued by the Armed Forces Institute of Pathology, dated July 18 and October 30, 1986, which indicate that, although the tooth is "not inconsistent" with the dental records of Simmons, the evidence is not sufficient to positively identify the tooth as belonging to Simmons. Plaintiff's Exhs. 5a, 5b. Nevertheless, plaintiff's forensic expert concedes that the tooth is Simmons',

---

**2.** *See also* 37 U.S.C. § 556(b), which provides in relevant part:

> After the end of the 12–month period in a missing status prescribed by section 555 of this title, the Secretary concerned, or his des-

ignee, shall, when he considers that the information received, or a lapse of time without information, establishes a reasonable presumption that a member in a missing status is dead, make a finding of death.

although he refuses to conclude on that basis that Simmons died at the time of the crash. *See* Defendant's Exh. 6.

Defendant claims that the discretionary function exception to the FTCA precludes the court from exercising jurisdiction over any portion of this claim.[3] Because the personnel excavating and identifying the remains found in 1986 at the crash site were acting under discretionary policy to begin with, and were within permissible policy judgments in deciding what procedures to follow and which forms to fill out, they are protected under the discretionary function exception.

The broad waiver of sovereign immunity embodied by the FTCA is specifically limited by § 2680(a), which excludes from federal court jurisdiction:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation ... or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused.

The Supreme Court has held that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function applies in a given case." *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). The primary inquiry is "whether the action is a matter of choice for the acting employee." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). If the action does involve judgment, the court "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Generally, judgment refers to "the discretion of the [employee] to act according to one's judgment of the best course." *Dalehite v. United States,* 346 U.S. 15, 34, 73

S.Ct. 956, 967, 97 L.Ed. 1427 (1953). Congress designed this discretionary function exception "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2765.

Defendant states that the efforts of the United States "to recover and identify the remains of her combat dead are based entirely on political, moral and military policy judgments." Of crucial weight in these judgments is the desire of the next of kin to have the remains of their loved ones brought home. *See Americans Missing in Southeast Asia: Hearings Before the House Select Comm. on Missing Persons in Southeast Asia,* 94th Cong., 2d Sess., Part 5 at 182 (1976). To pursue the search and recovery policy, the Armed Services have enacted various guidelines. Defendant refers to Army Field Manual 10–286, which describes the technical processing and investigative procedures to be used in identifying remains. The manual subsection entitled "Scope" states: "Because of the complexity of the subject matter, prescribed investigative procedures for identification processing of each recovered remains cannot be established." Defendant's Exh. 24 at 1–1. Defendant asserts that the authors of the manual intended to give individuals conducting searches the discretion to determine what particular procedures to use and which forms to file documenting the excavation based upon the circumstances surrounding the excavation. For example, defendant refers to one of the forms plaintiff cited, DD Form 1076, which is designed to inventory the personal effects found with an individual killed during combat. Because this excavation took place fourteen years after the gunship crashed, no personal effects were found with the remains other than a few ID tags. *See* Search & Recovery Narrative, Defendant's Exh. 2. The excavation personnel

---

**3.** Defendant extends the discretionary function argument to cover Brigadier General Emanuel's 1977 decision to declare Simmons KIA, on the ground that the statute specifically authorizes such decisions based upon all of the available

evidence. *See* 37 U.S.C. §§ 555(a)(2), 556(b). The court does not address this argument because plaintiff's claim as it relates to the 1977 decision is barred by the statute of limitations.

therefore determined that there was no need to file DD Form 1076. That same provision in the field manual was intended to provide employees identifying remains with discretion to determine what procedures are appropriate given the circumstances of each case.

In a matter remarkably similar to the case at bar, the Eleventh Circuit determined that the government's efforts to identify the remains of a flyer shot down over Laos in 1972 were protected by § 2680(a) because "[g]overnment efforts to identify deceased personnel are clearly discretionary functions." *Hart v. United States*, 894 F.2d 1539, 1545–46 (11th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990). The complaint in *Hart* focused on the Air Force's knowingly false positive identification of the flyer's remains and its refusal to return his status to "unaccounted for" after the false identification was rescinded. The government argued that the actions of its employees were based entirely upon policy judgments, reflecting a long standing program of searching for, recovering, and identifying dead American servicemen. The Eleventh Circuit held that the forensic technique used in the attempt to identify the flyer's remains, similar to a process of elimination, "is an exercise of discretion dependent on the circumstances; it is up to the discretion of the individual forensics examiner to determine how much to rely on these techniques." *Id.* at 1546. With regard to the Air Force's refusal to return the flyer to an unaccounted-for status, the court determined that the government "must make a practical decision at some point regarding when to discontinue the search for personnel. Such a decision must be discretionary in order for the Government to practically pursue such searches." *Id.* at 1548. The Eleventh Circuit's analysis, while not binding on this court, is clearly persuasive as to the facts at bar.

Also persuasive is the Sixth Circuit's application of the discretionary function exception to the implementation of a published Department of Defense safety regulation in *Totten v. United States,* 806 F.2d 698 (6th Cir.1986). Military Standard 882A was a generally worded directive to establish system safety programs for weaponry. The Air Force was given the discretion to determine the applicability of the standard to each activity, and to "adapt this standard to specific systems characteristics" by deleting, altering, or adding to its terms. The Sixth Circuit held that the standard "clearly directed the Air Force and other military departments to exercise discretion in adapting the standard to individual weapon systems operations." *Id.* at 702.

Similar logic can be applied to the case at bar, where Army Field Manual 10–286 states that "prescribed investigative procedures for identification processing of each remains cannot be established." Because a specific set of procedures was not prescribed in either the search or identification policies promulgated by defendant, the government employees involved in the excavation were forced to exercise their discretion in determining what procedures to follow and which forms to fill out documenting the excavation. The government employees involved with identifying the remains were forced to use their discretion as well in determining what procedures offered the most accurate identifications under the circumstances. Guided by the caselaw interpreting the discretionary function exception, these employees fall within the protective shield of that exception. While plaintiff lists some document numbers and complains that those published procedures were not followed, no argument has been presented to the court describing the procedures or how the defendant specifically failed to follow them. The plaintiff has not gone beyond the pleadings on this issue as required by Fed.R.Civ.P. 56(e) to withstand a motion for summary judgment. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The court must rely on defendant's characterization of the procedures and the discretion embodied therein. Therefore, plaintiff's claim for damages suffered as a result of

defendant's alleged failure to adhere to its own guidelines is outside this court's jurisdiction by virtue of the discretionary function exception. Defendant's motion for summary judgment as it applies to this aspect of plaintiff's complaint is hereby granted.

In conclusion, defendant's motion for summary judgment on the amended complaint is granted in full. The clerk of the court is directed to enter judgment for defendant and to dismiss the amended complaint.

It is So Ordered.