**DRAKE TOWING COMPANY, INC.,**
**Plaintiff-Appellee, Cross-Appellant,**

v.

**MEISNER MARINE CONSTRUCTION COMPANY, et al.,**
**Defendants-Appellees,**

v.

**UNITED STATES of America,**
**Defendant-Appellant,**
**Cross-Appellee.**

No. 84–7478.

United States Court of Appeals, Eleventh Circuit.

July 16, 1985.

Rehearing and Rehearing En Banc Denied Sept. 13, 1985.

R. Scott Blaze, Civ. Div., Torts Branch, Dept. of Justice, Washington, D.C., for U.S.

Donald C. Radcliff, Mobile, Ala., for Drake.

Before VANCE and JOHNSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

LEWIS R. MORGAN, Senior Circuit Judge:

The Dauphin Island Bridge crosses the Gulf Intracoastal Waterway, which runs east to west, in Mobile County, Alabama. As found by the district court, the "project channel" in the vicinity of the bridge has a width of approximately 150 feet and runs roughly down the middle of the Waterway. It is subsumed within the Waterway's "navigable channel." The navigable channel, approximately 350 feet wide (including the width of the project channel), is bounded on the north by a line of red buoys and on the south by a series of black buoys. The Army Corps of Engineers is generally responsible for maintaining the navigability of the project channel. In areas of the Waterway outside the project channel, the Corps is responsible for removing only those hazards to navigation known to them.

The bridge incurred extensive damage when Hurricane Frederick hit the Mobile area on September 13, 1979. After the hurricane, the Coast Guard closed the Waterway in the vicinity of the bridge and the Corps surveyed the project channel for obstructions to navigation. The Corps did not survey the area of the Waterway outside the project channel. The Coast Guard replaced in their original positions the buoys that were missing as a result of the hurricane and reopened the Waterway.

By permit dated January 3, 1980, the Coast Guard authorized the State of Alabama to replace the bridge. The plans for the new bridge called for the widening of the bridge's fender system, which was intended to protect the bridge from allisions with vessels navigating through the bridge. The horizontal clearance between the north and south fenders of the old bridge was 180 feet and included the width of the project channel. The clearance of the new bridge was to be 350 feet, but the project width was to remain at 150 feet. Alabama contracted with Meisner Marine Construction Company to demolish the old bridge and Brown & Root, Inc. to build the new one.

Meisner began work in February 1980, using explosives with the knowledge of the Coast Guard. In March, after the removal by Meisner of the fenders and the main concrete support piers behind the fenders, the Coast Guard placed four new, tempo-

rary buoys, two immediately to each side of the bridge construction site. Red buoy 12 Bravo was placed to the northwest, black buoy 13 Bravo to the southwest, red buoy 12 Alpha to the northeast and black buoy 13 Alpha to the southeast. The two temporary buoys on either side of the construction site (12 Bravo and 13 Bravo on the west and 12 Alpha and 13 Alpha on the east) were less than 350 feet apart. The other, permanent buoys were more than 350 feet ápart. Thus, the temporary buoys were compressed relative to the permanent buoy lines. The Coast Guard made no surveys or soundings before placing these temporary buoys. Meisner completed the removal of the bridge on April 19, 1980, and Brown & Root began construction of the new bridge soon thereafter.

The M/V SILVER CITY, owned by Drake Towing Company, passed eastbound through the construction site on November 7, 1981. Brown & Root had begun construction on the south fender system. As it passed between the future locations of the north and south fenders, the tug struck a submerged object and suffered extensive damage. The district court found that the object struck by the SILVER CITY was a large jagged piece of concrete deposited by the blasting of Meisner in demolishing the concrete piers of the old bridge. Covered by four to five feet of water, it was located approximately thirty feet north of the south fender system, outside the project channel but inside the channel marked by the black buoys. The SILVER CITY draws between six and seven feet of water. The Master Loose Leaf Light List in effect on November 7, 1981, represented that the temporary buoys were in water between seven and twelve feet deep.

Drake filed suit in the Southern District of Alabama against Meisner and Brown & Root on August 17, 1982. It added the United States as a defendant on November 17, basing jurisdiction upon the Suits in Admiralty Act (SAA), 46 U.S.C. § 742. *See* 28 U.S.C. § 1333. Drake settled with Meisner and Brown & Root before trial for $42,500 and the court dismissed those defendants from the case. After a bench trial in which the United States was the only defendant, the court found as follows:

> Originally, the Coast Guard placed buoys 180 feet apart (aligned with, and marking, the width of the old fender system) to mark the waterway. After the hurricane, the Coast Guard reestablished the buoys in their pre-hurricane position. In March of 1980, however, approximately one month before Meisner Marine had completed its work in the area, the Coast Guard relocated the buoys by moving them from their 180 foot width to a new width of 350 feet.

The court proceeded to hold that the Coast Guard breached its duty of due care in relocating the buoys without first determining the safety of the water in the newly-widened navigable channel. *Id.* at 285. The record does not indicate that the buoy lines were widened. The permanent buoy lines were originally about 350 feet apart. The Coast Guard simply added four new, temporary buoys. The parties agree that this factual discrepancy should not affect our review of the district court's decision.

The district court allocated the liability for Drake's damages as follows: 60 percent to Meisner, 0 percent to Brown & Root, 20 percent to the captain of the SILVER CITY and 20 percent to the United States. Determining Drake's total damages to be $51,951.52, the court entered judgment against the United States for $10,390, 20 percent of the total damages. Finally, the court denied Drake's request for prejudgment interest.

The government argues on appeal that (1) the district court was without jurisdiction to determine the negligence, if any, of the Coast Guard and (2) the Coast Guard owed no duty to Drake under the circumstances of this case. Drake cross-appeals the allocation of damages and the denial of prejudgment interest.

### *The Discretionary Function Exception to the Suits in Admiralty Act*

During the pendency of this appeal, the Eleventh Circuit held that the discre-

tionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), applies to suits under the SAA. *Williams v. United States,* 747 F.2d 700 (11th Cir.1984), *aff'g and adopting Williams ex rel. Sharpley v. United States,* 581 F.Supp. 847, 852 (S.D.Ga.1983). When applicable, that exception abrogates federal subject matter jurisdiction under the SAA. *See Williams,* 581 F.Supp. at 848, 854, 855. The United States therefore argues on appeal that the discretionary function exception bars this suit. *See Cruz v. Hauck,* 515 F.2d 322, 327 (5th Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976); *United States Shipping Board Emergency Fleet Corp. v. South Atlantic Dry Dock Co.,* 19 F.2d 486, 488 (5th Cir. 1927); C. Wright & A. Miller, *Federal Practice and Procedure,* § 1393, at 864–66 (1969).

■ The SAA provides the sole jurisdictional basis for admiralty claims against the United States. *Williams,* 581 F.Supp. at 855 (citing *McCormick v. United States,* 680 F.2d 345, 349 (5th Cir.1982)). After *Williams,* therefore, the United States is not subject to maritime tort claims based upon the alleged misfeasance or nonfeasance of "discretionary functions" by federal agencies or employees. 28 U.S.C. § 2680(a). The issue in this case is whether the Coast Guard's failure to determine the safety of the water before placing the temporary buoys is actionable.

■ "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* —— U.S. ——, ——, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660, 674 (1984). A governmental act is discretionary and therefore shielded from liability if it is performed "at a planning rather than operational level and involve[s] considerations more or less important to the practicability of the Government's ... program." *Dalehite v. United States,* 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953); *see Varig,* —— U.S. at ——, 104

S.Ct. at 2768, 81 L.Ed.2d at 678 (challenged government decisions affected "feasibility and practicality of government's regulatory program"); *Payne v. United States,* 730 F.2d 1434, 1437 (11th Cir.1984) (challenged governmental decision not to make study "inherent in the policy and planning decision" to redesign waterway). The government may be sued, however, for negligence in the nondiscretionary execution of discretionary decisions. *Payton v. United States,* 679 F.2d 475, 480 (5th Cir. Unit B 1982) (en banc); *see Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955). The ultimate determination is "the nature and quality of the discretion involved in the act complained of." *Smith v. United States,* 375 F.2d 243, 246 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). For the government to show merely that some choice was involved in the decision-making process is insufficient to activate the discretionary function exception. *J.H. Rutter Rex Manufacturing Co. v. United States,* 515 F.2d 97, 99 (5th Cir.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 359 (1976). The balancing of policy considerations is a necessary prerequisite. *Id.*

■ Under these principles, the initial decision to place aids to navigation such as the temporary buoys in this case is within the Coast Guard's discretion. *See* 14 U.S.C. § 81. Once such aids are established, however, negligence in their maintenance and operation implicates operational functions and is actionable. *Indian Towing,* 350 U.S. at 64, 69, 76 S.Ct. at 124, 126. We here address alleged negligence in the intermediate step of the actual placement or establishment of the buoys. We hold that the United States is subject to suit for such alleged negligence. The Coast Guard exercised its discretion when it decided to establish the buoys. The execution of that decision fell outside the discretionary function exception.

The government doggedly insists that *Dalehite* and *Varig Airlines,* both of which were suits under the Federal Tort

Claims Act, require us to extend the discretionary function exception to the establishment of the buoys as well as to the initial decision to place them. *Dalehite* concerned a federal fertilizer export program. Tons of the fertilizer exploded in the harbor of Texas City, Texas, causing colossal casualties and damages. The plaintiffs alleged no individual acts of negligence but charged negligence in the government's allowing shipment of the fertilizer into a congested area without warning of the fertilizer's known explosive characteristics. *Dalehite*, 346 U.S. at 23, 73 S.Ct. at 961. The district court found that the government had carelessly drafted and adopted the fertilizer program as a whole, committed specified negligent acts in the manufacture of the fertilizer and breached its duty in failing to supervise the loading of the fertilizer onto ships in the Texas City harbor. *Id.* The Supreme Court, reversing the findings of the district court, noted that each of the allegedly negligent acts was either itself performed at a policy-making level or executed pursuant to and in conformity with guidelines adopted at the policy-making level. *Id.* at 37–42, 73 S.Ct. at 969–971. They held that "acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Id.* at 36, 73 S.Ct. at 968.

The plaintiffs in *Varig Airlines* predicated their tort claims upon the negligence of the Federal Aviation Administration in certificating certain aircraft for commercial flight. They alleged that the FAA failed to detect and correct particular defects in the aircraft before certificating them. The Court explained that the FAA relies primarily upon the manufacturers and operators to insure that aircraft comply with pertinent regulations. The FAA polices compliance by conducting "spot checks" of the manufacturers' work. The Court characterized the plaintiffs' claims as challenging both the FAA's decision to implement the "spot check" compliance system and the use of that system in the certification of the particular aircraft involved. The FAA had adopted the compliance system

pursuant to delegated authority. *Varig Airlines*, ⸺ U.S. at ⸺, 104 S.Ct. at 2766, 81 L.Ed.2d at 676. The Court held that adoption to be activity protected by the discretionary function exception. As for the second prong of the plaintiffs' argument, the Court cited *Dalehite* for the proposition that "the acts of FAA employees in executing the "spot check" program in accordance with agency directives are protected by the discretionary function exception as well." *Id.* at ⸺, 104 S.Ct. at 2768, 81 L.Ed.2d at 678.

Thus, in both *Dalehite* and *Varig Airlines*, the Supreme Court held that the implementation of government policies or programs may be shielded from tort liability if the aspects of its performance alleged to be negligent are dictated by guidelines adopted at the policy-making level. Here, the Coast Guard decided to establish the buoys pursuant to official policy. 14 U.S.C. §§ 2, 81; 33 C.F.R. §§ 62.01–1, 62.-25–1. Negligence in that decision is therefore not actionable. We find no authority, however, by which the Coast Guard may establish aids to navigation without first determining the safety characteristics of the water the aids mark. *Dalehite* and *Varig Airlines* are therefore inapposite. The government cites other cases to support its argument. We have examined them but they are also unavailing to the government's case.

### The Duty of the Coast Guard

 The existence *vel non* of a duty on the part of the government is a question of law subject to our plenary consideration. The government's duty in this case is defined by the Coast Guard's undertaking. The Coast Guard official immediately responsible for the establishment of the buoys testified as follows:

[The four temporary buoys] were installed subsequent to the removal [of the old fender system] as an aid to the temporary construction that was being conducted in the bridge area.... Those were installed in 1980 to accommodate the bridge construction because they, in

effect, replaced what was originally there during the construction period, namely the bridge supports themselves and the attached fender systems.

Trial Transcript at 72–73. In response to a question as to the purpose of the red and black buoys, the same witness agreed that one purpose was to delineate a waterway safe for vessels with drafts shallower than the depth of the buoys as reflected by the pertinent light list. *Id.* at 83–84. We conclude from this evidence and from the applicable Coast Guard regulations, *see, e.g.,* 33 C.F.R. §§ 60.01–5(a), 62.25–1, that the Coast Guard, by placing the temporary buoys, undertook to facilitate safe navigation through the construction area. "[W]hen the government undertakes to perform services which would not be required in the absence of specific legislation, it will be liable if these activities are performed negligently." *Payton,* 679 F.2d at 483 (citing *Ross v. United States,* 640 F.2d 511, 519 (5th Cir.1981)). The Coast Guard was therefore bound to perform its undertaken responsibility with due care.

The government counters that the lateral buoyage system, *see* 33 C.F.R. § 62.25–1, is not an undertaking ensuring safe navigation. We agree. Our analysis, however, does not concern the entire lateral buoyage system. We address only the duty assumed by the government in placing the buoys involved in this case. The government also contends that the sole purpose of the temporary buoys was to accommodate the construction, not to aid navigation through the construction site. This argument is specious. Buoys are by definition "aids to navigation." *See* 33 C.F.R. § 60.-01–5(a).

### The Allocation of Liability

The allocation of liability was proper in this case. *Tringali Brothers v. United States,* 630 F.2d 1089, 1090 (5th Cir.1980); *see United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). Drake argues on its cross-appeal, however, that the district court erred in decreasing its recovery

against the United States by the percentage of liability attributed to Meisner, a nonparty to the trial of the case. Instead, continues Drake, the United States is properly liable for the full amount of the damages less only the amount attributable to the negligence of the captain of the SILVER CITY. Drake therefore concludes that the United States should pay 80 percent of the damages rather than only 20 percent.

The district court relied upon *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir.1979). Leger, employed by Drilling Well Control, Inc. (DWC), was injured while working aboard a barge owned by Dresser Offshore Services, Inc. during a workover operation on an offshore oil well owned by Continental Oil Company. He filed suit against DWC under the Jones Act and the general maritime law and against Continental and Dresser under the general maritime law. Travelers Insurance Company settled Leger's claim against Continental for $100,000 and his claim against DWC for $82,331.05. In return, Leger agreed to give Travelers one-half of any funds collected by Leger from Dresser. Leger then went to trial against Dresser, but DWC and Continental were represented in court. *See Ebanks v. Great Lakes Dredge & Dock Co.,* 688 F.2d 716, 720 (11th Cir.1982). The jury ultimately delineated liability as follows: 45 percent to Dresser, 20 percent to Continental, 0 percent to DWC, and 35 percent to Leger. The court therefore entered judgment against Dresser for 45 percent of Leger's total damages but did not credit Dresser's liability with any portion of Leger's settlement with the other defendants. Dresser argued on appeal that "where two of the original defendants have settled with the plaintiff for more than would have been their pro rata share of the total damages awarded to the plaintiff, the application of the doctrine of comparative fault constitutes an abuse of discretion in that it allows double recovery in favor of the plaintiff." 592 F.2d at 1248–49. The court of appeals rejected this argument and affirmed the district court. The rule of *Leger,* therefore, is that if a plaintiff sues

alleged joint tortfeasors in admiralty and one or more of the defendants settle with the plaintiff for a sum greater than the proportion of damages subsequently attributed to them by the factfinder at trial, and if the settling defendants are represented at the trial, then the nonsettling defendants are liable to the plaintiff to the extent of their respective percentages of negligence as applied to the plaintiff's total damages without any credit for the sum by which the settling defendants' payments exceed the settling defendants' proportionate liability. *See Gormly v. Van Ingen,* 736 F.2d 624, 625 (11th Cir.1983). *Leger* does not answer the question now before us, which is whether the trial court may decrease the liability of a defendant that is at trial by considering the negligence of a tortfeasor that is not.

*Ebanks v. Great Lakes Dredge & Dock Co.,* 688 F.2d 716 (11th Cir.1982), *cert. denied* 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983), does answer that question. The *Ebanks* plaintiffs were injured in a collision between a barge owned by their employer, Great Lakes, and a tanker owned by Chevron Transport Company and Chevron Shipping Company (Chevron). They settled their claims against Chevron and filed suit solely against Great Lakes under the Jones Act. Great Lakes filed a third party complaint against Chevron, but the trial court severed that action for separate trial. Chevron therefore was unrepresented at the trial in chief. The trial court nevertheless submitted to the jury special interrogatories that required them to determine the comparative degrees of causation attributable to Great Lakes and Chevron. The jury found that although Great Lakes was negligent, its negligence did not contribute to the injuries of the plaintiffs. They instead found Chevron 100 percent responsible for the disaster. A panel of this circuit reversed and summarized their holding as follows:

> Since the plaintiff is entitled to recover ... against either of several tortfeasors, without regard to the percentage of fault [*see Edmonds v. Compagnie General Transatlantique,* 443 U.S. 256, 260, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1979); *The Atlas,* 93 U.S. (3 Otto) 302, 23 L.Ed. 863 (1876)], it was error for the trial court to distract the juror's [sic] attention by requiring it to allocate the degree of fault between the defendant and a non-party. If the jury had found the causation in the negligence which it found against Great Lakes, and Great Lakes considered that the total amount of damages for the injuries received by these plaintiffs was disproportionate for it to bear, it could have obtained contributions against Chevron, as it had already undertaken to do, in a different proceeding. That issue was to be tried at a different time and between two live opponents, and not as part of the suit by the injured workmen and representative of a deceased workman against their employer under the Jones Act.

688 F.2d at 722. Likewise, Drake may recover its entire damages, less that proportion attributable to its own fault, from the United States.

■ One possible point of distinction between *Ebanks* and this case is that *Ebanks* was a jury case; this case was tried to the bench. Thus, unlike in *Ebanks,* we need not worry about confusing a jury. The distinction is without a difference. The court in *Ebanks* concentrated upon two problems. First, in a trial between Great Lakes and its employees that dealt with Great Lakes' failure to observe requisite safety precautions, any negligence of Chevron was irrelevant. 688 F.2d at 719. Second, the interjection of the issue of Chevron's responsibility unfairly imposed upon the plaintiffs the burden of minimizing the role of the Chevron tanker in the eyes of the jury; in effect, the plaintiffs were required to present Chevron's case as well as their own. *Id.* at 718, 722. These considerations are also present here. The issue of Meisner's liability is irrelevant to the determination of that of the United States. Drake should not be required to defend Meisner against the attempts of the United States to shift the liability for the accident to Meisner. The suit was Drake's.

It chose to go to trial against the United States alone, and it is entitled to full compensation, minus the amount attributable to its own negligence, from the United States. *United States v. The Juniata,* 93 U.S. (3 Otto) 337, 340, 23 L.Ed. 930 (1876).

Our holding does not leave defendants such as the United States without recourse. In a case that threatens mutual liability, the defendant may implead a third-party defendant "who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences." Fed.R.Civ.P. 14(c). Indeed, the maritime impleader rules were designed to allow the proper allocation of liability in a single action. *See The Hudson,* 15 F. 162 (D.C.N.Y.1883); Fed.R.Civ.P. 14(c) advisory committee note to 1966 amendment. *See generally* C. Wright & A. Miller, *Federal Practice and Procedure* § 1465 (1971).

■■■ We therefore remand the case to the district court for him to reallocate liability between Drake and the United States without considering the negligence of Meisner. *Ebanks* teaches that it is improper for the court to consider in the first instance the liability of a tortfeasor not represented at trial. To allow judgment on the basis of the allocation made by the district court would be to contravene this principle.

### Prejudgment Interest

As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. Discretion to deny prejudgment interest is created only when there are "peculiar circumstances" that would make it inequitable for the losing party to be forced to pay prejudgment interest.

. . . . .

If the trial court was not clearly erroneous in finding that peculiar circumstances exist, then its denial of prejudgment interest was discretionary. In most instances, we have not found such a denial to be an abuse of discretion. *Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 728-79 (5th Cir.1980). The district court refused to award prejudgment interest in this case because (1) Drake joined the United States as a defendant almost one year after the accident and (2) liability and the apportionment of liability were in genuine dispute. *See Noritake,* 627 F.2d at 728 n. 3; *Mecom v. Levingston Shipbuilding Co.,* 622 F.2d 1209, 1217 (5th Cir.1980). Drake seeks to justify its delay in filing suit against the United States by pointing out that at the time of the filing of the original complaint, the law in the Fifth Circuit as to whether a maritime tort suit against the United States was subject to the Federal Tort Claims Act (which contains an administrative exhaustion requirement) or the Suits in Admiralty Act (which has no such requirement) was unsettled. *See McCormick v. United States,* 645 F.2d 299, 300, 309-10 (5th Cir.1981) (suit may be brought under the Federal Tort Claims Act), *vacated on rehearing,* 680 F.2d 345, 349 (5th Cir.1982) (claim cognizable under only the Suits in Admiralty Act). We need not decide the effect of this justification on the district court's findings. The denial of prejudgment interest based upon the dispute as to liability and apportionment of damages was within the district court's discretion.

### Conclusion

We affirm the district court's imposition of liability upon the government and his denial of prejudgment interest. We vacate his allocation of liability, however, and remand the case to allow him to reallocate liability between Drake and the United States without considering the responsibility of Meisner.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.