Amerada Hess Corporation; American Trading Transportation Company, Inc.; ARCO Marine, Inc.; Bermuth Lembcke Company, Inc.; Chevron U.S.A., Inc.; Chiquita *Page 369 
Brands International, Inc.; Isbrandtsen Company, Inc.; Keystone Shipping Company; Marine Transport Lines; Marine Transport Management Company, Inc.; National Bulk Carriers; PACO Tankers, Inc.; Red Hills Corporation; United Brands Company; Unocal; and Warren Petroleum Company (all hereinafter referred to as the "shipowners") are defendants and third-party plaintiffs in an action by former seamen alleging asbestos injuries. The shipowners appeal from summary judgments in favor of Owens-Corning Fiberglass Corporation ("OCF") on their third-party claims seeking indemnity or contribution from OCF, whose asbestos products, it is alleged, were aboard the shipowners' vessels and injured the seamen. We affirm.
This case represents another installment in the ongoing maritime asbestos litigation addressed previously by this Court in Foster Wheeler USA Corp. v. Owens-Illinois, Inc.,595 So.2d 439 (Ala. 1992), and Sheffield v. Owens-Corning FiberglassCorp., 595 So.2d 443 (Ala. 1992). Personal representatives of the estates of Thomas Shepherd and James L. Burnett Sr. ("plaintiffs") sued OCF in the District Court of Dallas County, Texas, in 1987 and 1988, respectively, alleging that asbestos products manufactured by OCF had caused the deaths of their decedents, former seamen. These personal representatives, on February 8, 1990, and February 24, 1989, respectively, also filed actions against the shipowners in the Mobile County, Alabama, Circuit Court. In the Alabama actions, the plaintiffs alleged, inter alia, that the ships on which the seamen worked had been unseaworthy because of asbestos fibers aboard them. The shipowners, seeking indemnity or contribution, impleaded OCF and numerous other manufacturers of asbestos-containing products, which, they alleged, were responsible for the deaths of the plaintiffs's decedents.
Subsequently, OCF obtained agreements with the plaintiffs settling their claims against OCF and purporting to release OCF from any further liability arising out of the plaintiffs' claims. OCF then moved for summary judgments in the Mobile County Circuit Court, contending that the settlements with the plaintiffs barred the shipowners' claims against OCF for indemnity or contribution. In February 1991, the trial court entered summary judgments in favor of OCF in both cases. These judgments were subsequently certified as final judgments, pursuant to Ala.R.Civ.P. 54(b). The shipowners appealed. On July 15, 1992, this Court granted the shipowners' motions to consolidate the appeals of the summary judgments for briefing and oral argument. On August 12, 1992, the trial court granted motions filed by the shipowners to dismiss the plaintiffs' claims against them on the basis of the actions pending in Texas. In Shepherd v. Maritime Overseas Corp. 614 So.2d 1048
(Ala. 1993), we reversed the judgments dismissing the plaintiffs' claims against the shipowners and remanded their causes for further proceedings.
On these appeals of the summary judgments in favor of OCF, the shipowners contend that they are entitled to recover from OCF their attorney fees or damages in the event of a damages award, under (1) an indemnity theory or (2) a rule allowing contribution from a joint tort-feasor notwithstanding that tort-feasor's settlement with, and release by, the plaintiff.
 I. Indemnity
The shipowners contend that OCF's conduct in supplying asbestos-containing products for shipboard use was "actively" wrongful, while their fault consisted, they contend, only in failing to discover the danger of asbestos — conduct that they insist was only "passively" wrongful. See Wedlock v. GulfMississippi Marine Corp., 554 F.2d 240, 243 (5th Cir. 1977) ("the classic case of passive negligence occurs . . . when one joint tortfeasor creates a danger that the other (passive) tortfeasor merely fails to discover or to remedy"); AvondaleShipyards, Inc., v. Vessel Thomas E. Cuffe, 434 F. Supp. 920,928 (E.D.La. 1977) ("breach [of] an absolute duty to provide a seaworthy vessel" constitutes passive fault). They contend that maritime law accords them a right to recoup their attorney fees from OCF pursuant to a theory of "active" versus "passive" fault. *Page 370 
Preliminarily, we note that the procedural posture of the shipowners in this case renders their claims for indemnity particularly unpersuasive. Specifically, the shipowners arenonsettling, third-party plaintiffs seeking indemnity from third-party defendant OCF, following OCF's settlement with the plaintiffs.
"The basis for indemnity is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay." Restatement (Second) of Torts § 886B (1977), comment c. "The unexpressed premise has been that indemnity should be granted in any factual situation in which, as between the parties themselves, it is just and fair that the indemnitor should bear the total responsibility, rather than to leave it on the indemnitee. . . ." Id.
At this stage, the shipowners have satisfied no obligation. Nor has OCF, which was impleaded by the shipowners, been unjustly enriched by the shipowners' litigation. This case thus involves none of the traditional elements necessary to trigger a right to indemnity. On a more general ground, however, recent developments in maritime law render misplaced an admiralty defendant's reliance on the active-passive fault doctrine.
In 1975, the United States Supreme Court abrogated the "divided damages" rule set forth in The Schooner Catharine v.Dickinson, 58 U.S. (17 How.) 170, 15 L.Ed.233 (1855), which required joint maritime tortfeasors to share damages equally, regardless of their relative degrees of fault. United States v.Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708,44 L.Ed.2d 251 (1975). In so doing, it established in maritime law the concept of comparative fault, that is, a "rule requiring, when possible, the allocation of liability for damages in proportion to the relative fault of each party." Id. at 398,95 S.Ct. at 1709.
After Reliable Transfer, a number of admiralty courts concluded that maritime law no longer recognized a right to indemnity based on the active-passive fault distinction. Hardyv. Gulf Oil Corp., 949 F.2d 826 (5th Cir. 1992); Self v. GreatLakes Dredge Dock Co., 832 F.2d 1540 (11th Cir. 1987), cert.denied, 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988);Bass v. Phoenix Seadrill/78, Ltd., 749 F.2d 1154 (5th Cir. 1985); Loose v. Offshore Navigation, Inc., 670 F.2d 493 (5th Cir. 1982). In this connection, Loose offered the following pertinent comments:
 "The introduction of the rule of comparative fault to maritime torts requires reconsideration of the active-passive negligence doctrine. The common law courts were at first unwilling 'to make relative value judgments of degrees of culpability among wrongdoers.' The principle that an actively negligent tortfeasor should be required to indemnify a tortfeasor only passively negligent was developed to alleviate the harsh rule that prohibited apportionment among tortfeasors. In a sense, then, the indemnity rule was a precursor of modern systems of comparative fault because it attempted to transfer ultimate legal liability to the defendant truly in the wrong. Comparative fault seeks the same objective both more persuasively and more accurately. A comparative fault system not only eliminates the doctrine of contributory negligence but also apportions fault among joint tortfeasors in accordance with a precise determination, not merely equally or all-or-none.
 "It is difficult to see the need for the active-passive indemnification rule in a comparative fault system. While the active-passive concept is more equitable than strict nonapportionment, there have never been satisfactory distinctions between the definition of 'active' and 'passive.' The district court in this case did not attempt to define these terms, but left it to the jury to define them from their everyday significance. As the district judge pointed out, however, it would have been difficult on the authority of decided cases to phrase a charge that would have been instructive and clear. There is, therefore, all the more reason to determine the degree of responsibility of each tortfeasor on the facts as presented at trial, and then to apportion damages among the tortfeasors on that basis. Leger [v. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir. *Page 371 
1979),] has already extended the Reliable Transfer
concept of proportionate fault to maritime personal injury cases. We reaffirm that extension and emphasize what other courts and commentators have said before us: the concepts of active and passive negligence have no place in a liability system that considers the facts of each case and assesses and apportions damages among joint tortfeasors according to the degree of responsibility of each party."
670 F.2d at 500-02 (footnotes omitted). See also D. Owen and J. Moore III, Comparative Negligence In Maritime Personal InjuryCases, 43 La.L.Rev. 941, 955 (1983) ("rationale of ReliableTransfer 'is strongly at odds' with that of tort indemnity"). We find this reasoning persuasive and hold that there is no right to indemnity based on a distinction between active and passive fault in maritime actions filed in Alabama state courts.
 II. Contribution
OCF's contention that its settlements with the plaintiffs extinguish the shipowners' claims for contribution presents this Court once again with the question of the effect of a settlement on a tort-feasor's liability to joint tort-feasors for contribution. The issue was presented earlier in FosterWheeler USA Corp. v. Owens-Illinois, Inc., 595 So.2d 439,442-43 (Ala. 1992), another appeal spawned by the maritime asbestos litigation in progress in Mobile County. Although we ultimately deferred a decision on that question because of the brevity of the parties' treatment of the issue in relation to its potential impact on the large volume of pending cases, we stated:
 "The resolution of this issue is not without difficulty, as evidenced by the three approaches expressed in the Restatement (Second) of Torts § 886A, comment m:
 " 'm. Release. There are three possible solutions for the situation in which one tortfeasor pays a sum to the injured party and takes a release or covenant not to sue that does not purport to be a full satisfaction of the claim. Each has its drawbacks and no one is satisfactory.
 " '[Option I]. The money paid extinguishes any claim that the injured party has against the party released and the amount of his remaining claim against the other tortfeasor is reached by crediting the amount received; but the transaction does not affect a claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation. This has been called the fairest solution, but it has proved to be very discouraging to settlements. A tortfeasor (and his insurance company) has no incentive to make an individual settlement if he is not at all sure that it will extinguish his liability and allow him to close his books on the subject. This works most decidedly to the detriment of the settling tortfeasor, and the insurance companies have been strongly opposed to it.
 " '[Option II]. The money paid extinguished both any claims on the part of the injured party and any claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation and seeks contribution. This solution favors the settling tortfeasor and his insurance company and is supported by them. But it can be very unfair to the other tortfeasors and provides a clear incentive to collusion between the settling parties. To avert this it may be necessary to impose a requirement of "good faith." But once there is an attempt to provide objective criteria for determining whether a transaction is in good faith, the finality of the release comes into question, books cannot be closed and the major advantage of the solution is dissipated.
 " '[Option III]. The money paid extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other tortfeasors by the amount of the [pro rata] equitable share of the obligation of the released tortfeasor. This solution works strongly against the interest of the injured party and may have the effect of discouraging him from entering into a settlement. It may, for example, make it not desirable for him to accept the full amount of coverage in a minimum insurance policy if the equitable share of the obligation of the tortfeasor is likely to be substantially larger. *Page 372 
 " 'Important policy reasons therefore weigh against each of the three solutions. Case authorities and statutes are also divided and there is no semblance of a consensus. The experience in drafting the uniform laws depicts the difficulties of the problem. The 1939 uniform act adopted the first solution; the 1955 act supplanting it adopted the second solution; and the 1977 act supplanting it adopted the third solution.
 " 'The Institute leaves these issues to a caveat and takes no position.'
(Emphasis added [in Foster Wheeler USA].)"
595 So.2d at 442-43 (quoting Restatement (Second) of Torts § 886A (1977), comment m). The shipowners urge us to adopt Option I, under which, they contend, their claims against OCF for contribution would remain viable.
At the outset of our discussion of this issue, we note that "attorney's fees and legal costs incurred by the defending tortfeasor [are] not recoverable in contribution from the other negligent parties." ODD Bergs Tankrederi A/S v. S/T Gulfspray,650 F.2d 652, 655 (5th Cir. 1981). However, resolution of the question regarding the effect of the pro tanto settlements is necessitated by our reversal of the judgments dismissing the plaintiffs' claims against the shipowners in Shepherd v.Maritime Overseas Corp., 614 So.2d 1048 (Ala. 1993). Moreover, because the issue is of grave consequence to the litigation pending in Mobile County, we deem it expedient at this time to set forth rules governing its disposition.
Federal courts sitting in admiralty have reached no consensus on this issue. The Fifth Circuit Court of Appeals currently allocates damages among the tort-feasors on a pro rata basis consistent with Option III, as applied in Leger v. DrillingWell Control, Inc., 592 F.2d 1246 (5th Cir. 1979); see Teal v.Eagle Fleet, Inc., 933 F.2d 341 (5th Cir. 1991); Simeon v. T.Smith Son, Inc., 852 F.2d 1421, 1430 n. 11 (5th Cir. 1988) (in dicta, approving Leger's allocation method), cert.denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989);Vickers v. Chiles Drilling Co., 822 F.2d 535 (5th Cir. 1987);Martin v. Walk, Haydel Assoc., Inc., 742 F.2d 246 (5th Cir. 1984); or, alternatively, reduces the plaintiff's total claim by the amount of the pro tanto settlement, consistent with Option II, see Rollins v. Cenac Towing Co., 938 F.2d 599 (5th Cir. 1991), cert denied, ___ U.S. ___, 112 S.Ct. 1242,117 L.Ed.2d 474 (1992); Myers v. Griffin-Alexander Drilling Co.,910 F.2d 1252 (5th Cir. 1990) (disapproving Leger's damages allocation procedure); Hernandez v. M/V Rajaan, 841 F.2d 582
(5th Cir.), cert. denied, 488 U.S. 981, 109 S.Ct. 530,102 L.Ed.2d 562 (1988); but does not permit contribution from a settling tort-feasor as provided by Option I. Hardy v. Gulf OilCorp., 949 F.2d 826, 834 (5th Cir. 1992). The Seventh Circuit Court of Appeals rejected Option III but declined to choose between Options I and II. In re Oil Spill by the Amoco Cadiz,954 F.2d 1279 (7th Cir. 1992). The Eighth Circuit Court of Appeals has adopted Option III and criticized Option I.Associated Electric Cooperative, Inc. v. Mid-AmericaTransportation Co., 931 F.2d 1266 (8th Cir. 1991). See alsoStanley v. Bertram-Trojan, Inc., 781 F. Supp. 218 (S.D.N Y 1991) (expressly rejecting Option I and applying a combination of Options II and III).
Although these courts have expressed considerable divergence of opinion, they were virtually unanimous in declining to apply Option I until the Eleventh Circuit refused to recognize a settlement bar to contribution in Great Lakes Dredge Dock Co.v. Tanker Robert Watt Miller, 957 F.2d 1575 (11th Cir.), cert.denied, ___ U.S. ___, 113 S.Ct. 484, 121 L.Ed.2d 388 (1992).Miller v. Christopher, 887 F.2d 902, 906 (9th Cir. 1989) (criticizing Option I and noting that no federal admiralty court had applied it). The shipowners have been able to cite no other admiralty case applying that approach. However, they urge us to follow Great Lakes Dredge on the ground, inter alia, that because Alabama lies within the geographical area encompassed by the Eleventh Circuit, failure to follow Great Lakes Dredge
will lead to forum shopping. We share this concern; however, our concern over the potentiality of forum shopping is insufficient to override our reluctance to follow an approach that, in this Court's view, is inconsistent with the principles *Page 373 
of maritime law and has no support among the rest of the federal circuits that have addressed this issue.[1] Indeed, our reading of Great Lakes Dredge compels us to conclude that the Eleventh Circuit's rejection of Option III and its consequent adoption of Option I resulted from its misconstruction of Legerv. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir. 1979), a leading authority for the application of Option III.
In Leger, the plaintiff sued his employer, Drilling Well Control, Inc. ("DWC"), Dresser Offshore Services, Inc. ("Dresser"), and Continental Oil Company ("Continental") because of injuries he sustained while working on a barge owned by Dresser at the site of an offshore oil well owned by Continental. Id. Before trial, DWC and Continental settled with Leger for $82,331.05 and $100,000, respectively. Damages were awarded Leger in the amount of $284,090 and fault was allocated according to the following percentages: (1) Leger, 35%, (2) Dresser, 45%, (3) Continental, 20%, and (4) DWC, 0%. The district court entered a judgment against Dresser in the amount of $127,840, which "reflect[ed] the total damages of $284,090.00 reduced by $99,430.17 representing the 35% contributory negligence of the plaintiff and by $56,817.24 representing the 20% negligence attributed to Continental. No reduction in the judgment was made for DWC's settlement since DWC was found not to be negligent."* Id. at 1248. This procedure imposed upon Dresser, the nonsettling tort-feasor, liability for damages based solely on its pro rata share of the fault.
On appeal, Dresser contended that the trial court erred in refusing to calculate the judgment based on a pro tanto
reduction of the total judgment by $182,331.05, the amount of the plaintiff's settlement with DWC and Continental. It contended, moreover, that the damages recoverable under the court's pro rata method represented a windfall to Leger. The Court of Appeals for the Fifth Circuit rejected these contentions and affirmed the judgment. It explained:
 "In accord with its ground rules, the trial court rendered judgment against Dresser for $127,840.00, representing Dresser's percentage of negligence (45%) multiplied by Leger's damages as found by the jury ($284,090.00). Although Leger nominally received $310,171.05 by virtue of the settlement and the judgment, we do not consider this a double recovery. Leger merely obtained a favorable settlement. By releasing DWC and Continental in exchange for $182,331.05, Leger 'sold' or relinquished any claims which he had against them. See Rose v. Associated Anesthesiologists, 163 U.S.App.D.C. 246, 501 F.2d 806 (1974) (characterizing a settlement as a pro rata sale of the plaintiff's claim). At the time of the settlement negotiations, no one knew how a jury would apportion fault or in what amount it would find damages. By settling with Continental and DWC, Leger took the risk that he was foregoing a larger amount possibly to be obtained at trial. Likewise, Continental and DWC must have considered the amount for which they settled to be less than their exposure at trial would have been. Dresser made a different assessment. By going to trial it took the risk that the jury would find substantial damages and a high degree of negligence on its part. With the benefit of hindsight it is clear that only Leger correctly charted his course. However, according to the rules which we adopt today, Leger could have lost a great deal. For example, if he had settled with DWC and Continental for $182,331.05 and if the jury had found $1,000,000 in total damages, but that Dresser was only 5% negligent, Leger would have been left with the $182,331.05 in settlement with DWC and Continental and $50,000 in judgment against Dresser (5% of $1,000,000). He would have released a claim subsequently found to be worth $950,000 in exchange for $182,331.05. *Page 374 
He could not then complain that he made a poor settlement and that he should receive more based on the jury's assessment of his total damages at $1,000,000. Whether the plaintiff obtains a favorable or unfavorable settlement, he may only recover once for each wrongdoer's percentage of fault."
Leger, 592 F.2d at 1250 (footnotes omitted).
As pointed out above, only one of the two nonsettling tort-feasors, Dresser, had been found negligent. Because of the procedural posture of the parties as the result of this finding, Leger focused primarily on only one issue necessarily implicated by Option III, that is, the method of allocating damages among the nonsettling tort-feasors. Thus, the court was not squarely confronted with two other issues inherent in the application of that procedure — the question of joint liability among the nonsettling tort-feasors and the issue presented in this case, that is, the efficacy of a settlement as a bar to a nonsettling tort-feasor's right of contribution. As a corollary, however, the reduction of the plaintiff's claim by the amount of the settling tort-feasor's pro rata share of fault obviated the necessity of contribution from a settling tort-feasor — none of the nonsettling tort-feasors could be charged any amount representing the settling tort-feasor's share of fault. T. Schoenbaum, Admiralty and Maritime Law § 4-15, at 26 (Supp. 1992). The following remarks from Leger are also relevant in this connection:
 "The encouragement of settlements is the final factor which must be considered in this case. Whether the plaintiff or any of the defendants are ultimately found to have made a favorable settlement, we will 'respect the aleatory nature of the settlement process. . . .' Doyle v. United States, 441 F. Supp. 701, 711 n. (D.S.C. 1977). If Dresser were allowed to reduce Leger's recovery against it by the dollar value of Leger's settlement, Dresser would be left to pay a small portion ($284,090.00 total damages minus $182,331.05 settlement minus $99,400 for plaintiff's contributory negligence equals $2,358.95) of the total damages even though its negligence was the main contributing factor in causing them. Thus, Dresser would benefit substantially from its intransigence or miscalculation in refusing to settle the case. We refuse to adopt an approach which would reward a defendant for refusing to settle. If a party decides to try a case, it must be prepared to accept whatever benefits or burdens flow from its decision."
Id. at 1250-51.
The presence in Leger of only one negligent nonsettling tort-feasor also occasioned Leger's most conspicuous unanswered question, that is, whether liability among remaining nonsettling tort-feasors remained joint. That Leger could be read as adopting a modified form of joint liability apparently caused some courts to reject that approach — most significantly, the Eleventh Circuit, which in a trilogy of decisions rejected the Leger approach and applied Option I.[2]
The litigation precipitating the Eleventh Circuit's application of Option I involved three successive appeals, beginning with Ebanks v. Great Lakes Dredge Dock Co.,688 F.2d 716, 718 (11th Cir. 1982), cert. denied, 460 U.S. 1083,103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); including Self v. GreatLakes Dredge Dock Co., 832 F.2d 1540, 1544 (11th Cir. 1987),cert. denied, 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604
(1988); and culminating in Great Lakes Dredge Dock Co. v.Tanker Robert Watt Miller, 957 F.2d 1575 (11th Cir.), cert.denied, ___ U.S. ___, 113 S.Ct. 484, 121 L.Ed.2d 388 (1992). The litigation arose out of a collision on the St. Johns River between a dredge owned by Great Lakes Dredge Dock Company ("Great Lakes") and a tanker owned by Chevron Transport Corporation ("Chevron"). The plaintiffs, having settled their claims against Chevron, sued Great Lakes, their Jones Act employer. The third-party claims of Great Lakes against Chevron for contribution were severed; thus, Chevron was not a defendant in the initial trial. *Page 375 
At trial, the jury, pursuant to special interrogatories on which it was to determine the relative percentages of fault of all entities involved in the accident, attributed 100% of the fault to Chevron, a nonparty. Consequently, it assessed no damages.
The issue in Ebanks, the first appeal, concerned only the proper method of apportioning fault.[3] Great Lakes contended that the method of allocation was consistent with, and required by,Leger. The court distinguished Leger on the ground that Chevron, unlike the settling defendants in Leger, had never been subject to the plaintiffs' claims. Ebanks, 688 F.2d at 720. More significantly, however, the court concluded thatLeger's "effect as precedent [had] been weakened" by Edmonds v.Compagnie Generale Transatlantique, 443 U.S. 256,99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), Ebanks, 688 F.2d at 720, which involved the proper construction of an amendment to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905.
The amendment at issue in Edmonds prevented a negligent shipowner from recouping from a longshoreman's employer, whose negligence concurred with that of the shipowner to injure the longshoreman, any damages for which the shipowner might be liable. The United States Supreme Court held that the amendment did not abrogate the rule of joint liability long recognized in maritime torts in favor of a proportionate fault rule.[4]443 U.S. at 263-64, 99 S.Ct. at 2757-58. Edmonds thus reaffirmed the rule allowing a maritime plaintiff "to sue in a common-law action all the wrong-doers, or any one of them, at his election," and, absent contributory negligence, to obtain a "judgment in either case for the full amount of his loss." Id.
at 260 n. 7, 99 S.Ct. at 2756 n. 7 (quoting The Atlas, 93 U.S. (3 Otto) 302, 315, 23 L.Ed. 863 (1876)).
Ebanks concluded that because maritime law, as reaffirmed byEdmonds, provided for recovery "against either of several tortfeasors, without regard to the percentage of fault, it was error for the trial court to distract the [jury's] attention by requiring it to allocate the degree of fault between the defendant and a non-party." 688 F.2d at 722. Implicit throughout the court's analysis of the allocation issue was its view that the Leger approach involved a modified form of joint liability and was, consequently, inconsistent with traditional principles of maritime law. This view of Leger was even more prominent in Self v. Great Lakes Dredge Dock Co.,832 F.2d 1540, 1544 (11th Cir. 1987), cert. denied, 486 U.S. 1033,108 S.Ct. 2017, 100 L.Ed.2d 604 (1988), on appeal following return to remand.
After remand by Ebanks, Great Lakes settled with all the plaintiffs except Vivian Self, the widow of a former seaman employed by Great Lakes. In the second trial of that case, the trial judge (1) apportioned the fault of Chevron and Great Lakes vis-à-vis each other but reserved to a subsequent trial an adjudication of their damages, (2) determined the liability of Great Lakes to Self, (3) and awarded damages to Self. Self explained the findings of the trial court as follows:
 "The court found that Self's total damages amounted to $661,354.00 and that Chevron bore 70% of the fault for the accident while Great Lakes bore 30%. Because Self had already settled with Chevron [for $315,000], and because the trial court was of the view that this court's opinion in Leger v. Drilling Well Control, Inc., 592 F.2d 1246
(5th Cir. 1979), required an apportionment of damages, the court awarded Self a judgment of $198,406.20 against Great Lakes, which represents 30% of Self's total damages."
Self, 832 F.2d at 1544-45.
A panel of the Eleventh Circuit reversed that portion of the judgment awarding damages on the basis of Great Lakes' pro rata *Page 376 
share of fault. It held that the plaintiff's damages from the nonsettling tort-feasor should be calculated on a pro tanto
basis, that is, a reduction by the amount of her settlement with Chevron, the settling tort-feasor. Id. at 1548.
Focusing once again on the perceived tension betweenLeger and Edmonds, the court construed Leger as standing for the proposition that "it is the plaintiff who bears the loss or obtains the gain." Self, at 1546 (emphasis added). Concluding that such a rule was inconsistent with Edmonds, which, according to Self, required the maritime defendant to bear "any inequity which results from the implementation of a seaman's damage award," id., the court went further than it had in Ebanks, declaring, in effect, that Leger could not "withstand the more recent Edmonds opinion." Self, at 1546 (citing Joia v. Jo-Ja Service Corp., 817 F.2d 908 (1st Cir. 1987), cert. denied, 484 U.S. 1008, 108 S.Ct. 703,98 L.Ed.2d 654 (1988), and Drake Towing Co. v. Meisner Marine Const. Co.,765 F.2d 1060 (11th Cir. 1985)).
After Self, Great Lakes settled with Self's estate for $2,050,000 and, contending that it had paid more than its equitable share of the damages, subsequently sought contribution from Chevron. Great Lakes Dredge Dock Co. v.Tanker Robert Watt Miller, 957 F.2d 1575 (11th Cir.), cert.denied, ___ U.S. ___, 113 S.Ct. 484, 121 L.Ed.2d 388 (1992). Thus, for the first time in that litigation, the Eleventh Circuit was directly confronted with the issue presented inthis case, that is, the preclusive effect to be accorded a settlement and release.
In Great Lakes Dredge, the third and latest appeal in that litigation, the court framed the issue as "[w]hether, given thepro tanto method adopted in Self, a joint tortfeasor who is forced to bear more than its fair share of an injured party's damages is prohibited by a settlement bar rule from seeking contribution from a settling joint tortfeasor." Id. at 1580. That the Great Lakes Dredge court was not writing on a clean slate is obvious from the terms in which the court framed the issue. Indeed, the court expressly concluded that Self had "overruled Leger and rejected the proportionate distribution of liability." 957 F.2d at 1581.
Considering itself bound by stare decisis, id. at 1580 n. 4, to reject one of the two options that bars contribution from a settling tort-feasor, the court next compared the relative advantages and disadvantages of Options I and II. Observing that a nonsettling tort-feasor could, under the pro tanto
approach adopted in Self, "be forced to pay for more than [its] proportionate share of damages," the court concluded that on balance, an equitable distribution of damages among nonsettling tort-feasors through the right of contribution outweighed the policies favoring settlements. 957 F.2d at 1581.
We might be inclined to agree with the approach thus adopted by the Eleventh Circuit if its analysis of Leger and, therefore, Option III were sound. We conclude, however, that the opposite is true. The court's analysis proceeded upon the premise that Option III as applied in Leger abrogated or modified joint liability among nonsettling tort-feasors. Such an approach would relieve nonsettling tort-feasors not only of the liability represented by the pro rata share of settling
tort-feasors, but also of liability represented by the pro rata
shares of the nonsettling tort-feasors, thus requiring theplaintiff to bear the risk, for example, of a nonsettling tort-feasor's insolvency. Such an approach would, indeed, contravene the policy of maritime law, which has traditionally provided "special protection" for injured seamen. Self v. GreatLakes Dredge Dock Co., 832 F.2d 1540, 1548 (11th Cir. 1987),cert. denied, 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604
(1988); Joia v. Jo-Ja Service Corp., 817 F.2d 908, 917 (1st Cir. 1987), cert. denied, 484 U.S. 1008, 108 S.Ct. 703,98 L.Ed.2d 654 (1988); see also Cosmopolitan Shipping Co. v.McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949).
Nothing in the text of the Restatement, however, or, for that matter, Leger, requires this result.[5] Significantly, the Fifth Circuit has recently declared expressly that *Page 377 Leger did not "eliminate the well established maritime rule of joint liability." Simeon v. T. Smith Son, Inc.,852 F.2d 1421, 1430 n. 11 (5th Cir. 1988), cert. denied, 490 U.S. 1106,109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Option III, therefore, does not prevent a maritime plaintiff from recovering all his damages — minus an amount represented by the settling tort-feasor's percentage of fault — from any of the nonsettling tort-feasors. As among those tort-feasors, contribution provides the vehicle through which an equitable distribution of damages may be achieved. See Miller v.Christopher, 887 F.2d 902, 904 (9th Cir. 1989). The tort-feasors, rather than the plaintiff, thus bear the risk of a joint tort-feasor's insolvency.
Because this Court's understanding of Option III andLeger differs fundamentally from the construction offered by the Eleventh Circuit, we see no tension between Option III and maritime law such as was expressed in the Ebanks-Self-GreatLakes trilogy. On the contrary, this approach appears to represent the most efficient method of accommodating the policies of federal and maritime law. As discussed above, the reduction in a plaintiff's claim by the pro rata method of Option III is as likely to inure to the plaintiff's benefit as a pro tanto reduction, which obtains pursuant to Options I and II, and it does not seem unreasonable to require the plaintiff to forgo that portion of his claim represented by the pro rata
fault of the tort-feasor with which he voluntarily settled. Apro rata reduction in the plaintiff's total claim also prevents unfairness to the nonsettling tort-feasors that can occur under Option II's pro tanto reduction, which "allows the plaintiff, in effect, to 'repudiate' his bargain since he can be made whole out of the pockets of the non-settling tortfeasors." T. Schoenbaum, Admiralty and Maritime Law § 4-15, at 26 (Supp. 1992). Indeed, allocation of damages based on the settling tort-feasor's pro rata share of fault obviates the need for contribution to nonsettling tort-feasors. Id.
The application of Option III, which, unlike Option I, recognizes the finality of a settlement, also accommodates the policy of the federal courts favoring settlements. See Fed.R.Civ.P. 68; Marek v. Chesny, 473 U.S. 1, 12-13,105 S.Ct. 3012, 3018, 87 L.Ed.2d 1 (1985) (Powell, J., concurring);Williams v. First Nat'l Bank, 216 U.S. 582, 595, 30 S.Ct. 441,445, 54 L.Ed. 625 (1910) ("Compromises of disputed claims are favored by the courts."); see also Stanley v. Bertram-Trojan,Inc., 781 F. Supp. 218, 222 (S.D.N.Y. 1991).
Moreover, allowing contribution from settling tort-feasors could subject plaintiffs to liability for damages and expenses recovered by nonsettling defendants from settling defendants. For example, the settlement agreements involved in this case contained the following provision:
 "In consideration for the payment of the aforesaid sum, the Plaintiffs . . . agree to and do hereby indemnify and hold harmless OCF from any and all liability for the payment of damages by reason of any claim asserted by any person, firm, corporation or entity against OCF for indemnity or contribution as a result of any claim, demand, settlement, judgment or payment made to the Plaintiffs or their representatives, heirs or assigns, arising out of any injuries, disease, damages or death to decedent or loss of consortium or other damages to Plaintiffs."
(Emphasis added.) Based on this indemnity provision, OCF has stated its intention to pursue its rights and remedies against the plaintiffs in the event the shipowners' claims against it are successful.
These considerations compel us to conclude that Option III affords the appropriate method for the disposition of maritime cases filed in Alabama state courts. The shipowners are, therefore, precluded by OCF's settlements from seeking contribution from OCF for attorney fees or damages.
The shipowners further contend that even under Option III a settling defendant must remain in the suit to litigate the issue of its own percentage of fault. They suggest that the alternative, that is, requiring the plaintiff to minimize at trial the settling tort-feasor's percentage of fault is unworkable and unfair to the plaintiff. Thus, they contend *Page 378 
that the trial court erred in granting OCF's motions for summary judgment.
We agree that Option III requires the trier of fact to determine the percentage of the settler's fault. Stanley v.Bertram-Trojan, Inc., 781 F. Supp. 218, 222 (S.D.N.Y. 1991);Bordelon v. Consolidated Georex Geophysics, 628 F. Supp. 810,812-13 (W.D.La. 1986); see also M. Yeates, P. Dye, Jr., and R. Garcia, Contribution and Indemnity in Maritime Litigation, 30 S.Tex.L.Rev. 215, 246-47 (1989). However, we do not agree that requiring the plaintiff to exculpate the settling tort-feasor at trial is unworkable or necessarily inures to the plaintiff's detriment. On the contrary, requiring an alleged tort-feasor to remain in the suit after reaching a settlement with the plaintiff would virtually nullify the utility of the rule recognizing a settlement bar to contribution — one of the principal advantages of Option III. Just as "a tortfeasor has no incentive to enter an individual settlement if it will remain vulnerable to suit based on plaintiff's claim," Stanleyv. Bertram-Trojan, Inc., 781 F. Supp. 218, 222 (S.D.N Y 1991), it would seem to have little more incentive to settle if it were required to remain in the suit, thus incurring further litigation expense. Bordelon v. Consolidated Georex Geophysics,628 F. Supp. 810, 812-13 (W.D.La. 1986). Moreover, an alleged tort-feasor constrained to litigate the issue of its own fault after a settlement and release would have little incentive to mount a compelling defense of a position for which it could not incur further liability regardless of the outcome of the suit.Bordelon, 628 F. Supp. at 812-13 (W.D.La. 1986). Indeed, it is not unreasonable to suppose that a jury seeking to determine the percentage of fault attributable to a settling tort-feasor would find more persuasive the plaintiff's vigorous efforts at exculpating the alleged tort-feasor, bolstered, no doubt, by evidence gleaned through the tort-feasor's cooperation incident to dismissal from the suit, than the grudging defense of an unwilling litigant.
In sum, the shipowners have failed to demonstrate in what respects this procedure is unworkable, and we disagree with their contentions that it is unfair. We conclude, therefore, that the summary judgments in favor of OCF were proper; those judgments are affirmed.
1911251 — AFFIRMED.
1911252 — AFFIRMED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, HOUSTON and STEAGALL, JJ., concur.
[1] This Court is not bound by decisions of lower federal courts.Ballew v. State, 292 Ala. 460, 296 So.2d 206 (1974), cert.denied, 419 U.S. 1130, 95 S.Ct. 816, 42 L.Ed.2d 830 (1975);Seibold v. State, 287 Ala. 549, 253 So.2d 302 (1970). This rule is particularly applicable where, as here, the circuits are in conflict. See Note, The State Courts and the Federal CommonLaw, 27 Alb.L.Rev. 82 (1963).
* We recognize that the computations seem not to be precise.
[2] A panel decision in the Court of Appeals for the First Circuit also appears to have concluded that Leger modified traditional principles of joint and several liability. Joia v. Jo-JaService Corp., 817 F.2d 908 (1st Cir. 1987), cert. denied,484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).
[3] Preliminarily, the court acknowledged that it was bound byLeger pursuant to Bonner v. City of Prichard, 661 F.2d 1206
(11th Cir. 1981), in which an en banc Court of Appeals for the Eleventh Circuit formally adopted the case law of the Fifth Circuit, from which the Eleventh Circuit was formed by the Fifth Circuit Court of Appeals Reorganization Act of 1980, P.L. 96-452, 94 Stat. 1995.
[4] The Court of Appeals for the Fourth Circuit had construed the statute as limiting the liability of the shipowner to its prorata percentage of fault.
[5] As we noted above, the issue of joint liability among nonsettling tort-feasors did not arise in Leger because that case involved only one nonsettling tort-feasor.